# GEORGE W. BURTON *et al.*

## *v.*

# JAMES S. PERRY *et al.*

### *Filed at Springfield April 3, 1893.*

146 71
155 590

146 71
161 407

146 71
156 213
157 484

146 71
162 582

146 71
61a 136

146 71
166 30
167 384

146 71
74a 473

146 71
181 644

146 71
186 43589
89a 37544

146 71
f188 4074

146 71
189 40451

146 71
194 21 36
194 29193

146 71
201 29187
201 23217
103a 22405

146 71
204 453
204 36639
205 43139
206 9589

146 71
211 1564

146 71
213 407

146 71
215 3562

1. CONTRACT—*when champertous.* A party claiming title to a tract of land in this State, entered into a contract with a real estate agent to convey to the latter one-half of such interest in the land as he should finally recover, upon condition that such agent should take possession of the property, employ attorneys, perfect the title, and pay all expenses and attorney's fees: *Held,* that the agreement was champertous and void. But the question of its legality and validity is immaterial, except in a suit between the parties to it.

2. LIMITATIONS—*seven years' payment of taxes.* To constitute a bar under either section 6 or 7 of the Limitation law, it must be shown that all the taxes on the land have been paid, under color of title, for seven successive years while vacant and unoccupied, or that the party so paying was in possession of the premises during such period of seven years for which he has paid such taxes.

3. In order to create a bar under the first section of the act of 1839, or section 6 of the present Limitation law, seven years must elapse between the date of the first payment, when the statute begins to run, and the commencement of the suit.

4. SAME—*color of title.* Any deed which purports, on its face, to convey title, may be used as color of title, under section 6 of the Limitation act, which provides for possession and payment of taxes for seven years, and under section 7 of the same act, which provides for payment of taxes for seven years while the land is vacant and unoccupied. A tax deed may be good color of title under those sections, even though the judgment and precept upon which it is based are absolutely void.

5. SAME—*when prima facie title is necessary.* Under section 4 of the Limitation act something more than color of title is required to constitute a bar. That section requires a *prima facie* title, which is not shown by a tax deed, without the judgment and precept upon which it is based.

6. SAME—*section 4 construed.* By the terms of section 4 of the act the officer must be "authorized". to sell the land for the non-payment of the taxes, and unless the judgment and precept are produced no authority to sell is shown. It can not be said that the language of the section refers to any deed which a public officer may make without

pretence of authority. On the contrary, the deed must be one which is made in pursuance of the authority conferred by law.

7. In order to show a *prima facie* title under section 4 of the Limitation law, notice, by personal service or by publication, to the owner must be shown before a tax deed of his land can be lawfully executed by a public officer. Such a deed is made without authority unless the notice prescribed by the statute is first given. The affidavit showing the tax purchaser's right to a deed is a necessary part of the *prima facie* title, and, if it does not show a compliance with section 216 of the Revenue law, the tax deed is not such a *prima facie* title as is required by section 4 of the Limitation law.

8. SAME—*of the possession required under section 4.* The actual residence specified in section 4 of the Limitation law is not an unlawfully acquired possession. When it is obtained by either forcing or persuading the tenant of the owner to attorn to the party claiming under the section, it can not avail him.       •

9. SAME—*as to assignee in bankruptcy.* The right of an assignee in bankruptcy, or his grantee, to file a bill to set aside a tax deed as a cloud on title, is barred in two years from the time the right of action accrues.

10. BANKRUPTCY—*when title of bankrupt passes to his assignee.* The property of a bankrupt passes to his assignee by the execution of the assignment by the register, conveying the estate of the bankrupt. Such assignment relates back to the commencement of the bankruptcy proceeding, and by operation of law vests the title to all the bankrupt's property in the assignee.

11. SAME—*property not received or disposed of by the assignee.* The assignee is not bound to take possession of or claim all of the property named in the bankrupt's schedule. · He may reject such of the assets as may be a burden rather than a benefit to the estate. He may decline to receive property which is so heavily incumbered as to make it injudicious to receive it.

12. The Bankrupt law makes no provision for the reconveyance of the property undisposed of by the assignee, to the bankrupt; but as the assignee takes no title as an individual, but only as an officer, the title reverts to the bankrupt when the trust is ended and the officer discharged. When the creditors are settled with and the bankrupt is discharged, and the estate is wound up, and the assignee is discharged, the bankrupt becomes reinstated in his original title to property not disposed of by the assignee.

13. SAME—*when successor to assignee may be appointed.* A successor to an assignee in bankruptcy can only be appointed in case of the death, removal or resignation of the former one before the settlement of the bankrupt estate. But when the trust is closed, and the assignee

has done his duty and has been discharged, a new assignee can not be appointed without the institution of a new proceeding in bankruptcy in accordance with the provisions of the act.

14. MORTGAGE—*conveyance by mortgagor in extinguishment of right of redemption—intention.* In order that a conveyance made by a mortgagor to the mortgagee shall operate as an extinguishment of the right of redemption, it must appear that the parties intended such conveyance to be a payment of the debt.

15. The intention to pay the debt by a deed of the mortgaged property will not be inferred when the creditor retains the evidences of the indebtedness and the securities pledged for its payment.

16. The deed will not be regarded as a release of the equity of redemption unless it is made for a consideration which is adequate, and which would be deemed reasonable if the transaction were between other parties. If the value of the mortgaged property greatly exceeds the debt secured by the mortgage, that fact will tend to show that a release was not intended.

17. A subsequent recognition by the mortgagee, of the continued existence of the relation of debtor and creditor between the mortgagor and himself, will be a circumstance tending to show the absence of such an intention.

18. A mortgagor, at the request of the mortgagee, made to the latter a conveyance of the property, then in litigation with other parties, for which no consideration was paid. Neither the mortgage, nor the notes secured thereby, nor notes pledged as collateral security, were surrendered or canceled, and the circumstances showed that the deed was made to cure a supposed defect in the mortgage, in accordance with the mortgagor's agreement to make further assurance and deeds when requested, and the mortgagee, after the delivery of the deed, recognized the continued existence of the relation of debtor and creditor, by its pleadings in a suit relating to the mortgaged premises: *Held,* that the conveyance by the mortgagor was not an absolute deed, but a further security for the mortgage debt.

19. SAME—*duty of mortgagee to pay taxes.* As a general rule, the mortgagee not in possession is under no obligation to pay the taxes upon the mortgaged premises.

20. SAME—*right of mortgagee to recover for expenses in protecting the security.* Where the mortgagee, being clothed with the legal title by the mortgagor, succeeds in setting aside tax titles for the benefit of the mortgagor as well as himself, the mortgagor, on being restored to the legal title, may be required to reimburse the mortgagee his outlays in removing the adverse titles and incumbrances, such as taxes, tax titles, redemption money and reasonable attorney's fees.

21. SAME—*foreclosure—failure of consideration.* A sold and conveyed forty acres of land by warranty deed to B, for the sum of $12,000, of which $3000 was paid down, and the remainder was secured by notes and mortgage. B, by like deed, conveyed the premises to C, and he to D, who mortgaged the same to a bank to secure a debt of his own. A transferred the notes given to him, to W, who filed his cross-bill to foreclose the mortgage given by B. It appeared that there was due on the notes only $6000. The title to the undivided one-fourth of the land failed : *Held,* that B and his grantees had the right to set up the failure of the warranty as to an undivided fourth of the land as a defense, *pro tanto,* to the collection of the notes.

22. SAME—*defense, in equity, against the assignee.* Where the assignee of notes secured by deed of trust seeks to enforce collection by foreclosure of the trust deed, the mortgagor and his grantees may set up the same defense against the assignee as against the original payee.

23. SAME—*parol evidence to show right of redemption.* The relations between the parties, and other facts and circumstances of a nature to control the deed and establish such an equity as would give a right of redemption, may be shown by parol evidence.

24. JURISDICTION—*unknown heirs—ancestor living.* A decree rendered in a cause against the unknown heirs and devisees of a person supposed to be dead, when he, in fact, is living, is void as to such person, and can not affect his rights to property. During his life he can have no heirs and devisees capable of being sued as unknown heirs, etc.

25. PARTIES—*statute relating to unknown heirs, construed.* In authorizing the heirs of a deceased person who has been interested in land, to be made parties under the name of unknown heirs, when their names are unknown, the statute presupposes that the death of such person is an established fact. It was never designed to cut off the rights of such a person while in life, even as against innocent purchasers for value. It has reference to deceased persons, and not to live persons.

26. On bill against the unknown heirs and devisees of each of two former claimants of a tract of land, to enforce the specific performance of a contract of sale, in which the proceedings were regular in form, the court, by its decree, found that such claimants were both dead, and that their heirs and devisees were unknown. Many years after, one of such claimants was found to be living : *Held,* that the decree was a nullity as to such person, but was valid as to the other, there being no evidence to impeach the decree as to him or his heirs.

27. DECREE—*when final as to the unknown heirs.* A decree against the unknown heirs and devisees of a deceased person, who are notified by publication, only, of the pendency of the suit, does not become

final until after the lapse of three years, and parties purchasing during that time will do so subject to the contingency that the decree may be set aside. But when the three years have passed and no steps are taken by such defendants to open the decree, it will have the same effect as though there had been personal service.

28. SAME—*impeaching for fraud.* There are two kinds of fraud in respect to judicial proceedings,—fraud in obtaining a decree by false evidence, and fraud which gives the court a colorable jurisdiction over the defendant's person. In case of a fraud of the former kind a decree can not be impeached in a separate and independent proceeding, though it is otherwise in the case of a fraud of the latter kind.

29. RECORDING LAW—*protection against unrecorded deed.* Although the legal title passes by an unrecorded deed, as between the parties, yet, by force of the recording laws, it is postponed in favor of a subsequent deed to a *bona fide* purchaser which is recorded; and this rule applies as well to *bona fide* subsequent purchasers from heirs, as to purchasers from the ancestor. It also applies to subsequent purchasers at judicial sales.

30. Where a deed is not recorded the title is, apparently, still in the grantor, and the law allows purchasers who are ignorant of the conveyance to deal with him as the real owner. In case of his death the heir becomes the apparent owner of the legal title, and the public may deal with him as the real owner. And when the facts authorize a statutory proceeding against the unknown heirs holding the apparent title, the prosecution of such a proceeding to the end, and the securement of a title thereunder, amount to a dealing with such heirs as the real owners, just as much as would be a purchase from heirs whose names are known.

31. In 1836, A, the owner of an eighty-acre tract of land, conveyed to B and C an undivided half thereof, who, by their unrecorded written contract, agreed to reconvey the same to the grantor in payment of what they each owed him. In 1848 B conveyed his interest in the land to C, by a deed which was lost without being recorded. In 1869 A and other parties claiming title under him filed their bill in chancery against the unknown heirs and devisees of both B and C, for the specific performance of the contract of sale made by B and C to A, which resulted in a decree, in 1870, requiring such unknown heirs to convey to the complainants, in severalty, the north half to one and the south half to the other, in accordance with a partition made between them, and in default of such conveyance requiring the master to make the same for them. In 1871 or 1872 C made a conveyance of the eighty acres to P and H, who filed their bill for partition : *Held,* that the decree of 1870 was absolutely void as to C for the want of jurisdiction of the court over his person, but that it was binding upon the heirs of B,

and that the persons acquiring their apparent title to the undivided one-fourth of the land without notice of the prior unrecorded deed of their ancestor, took the title thereto the same as if such deed had never been made.

32. SAME—*mortgagee protected against a secret interest in land.* The holder of a writing showing that another holds the legal title for their joint use and benefit, can not enforce his right to one-half of the land, as against a mortgage given by the latter to one who has no notice of the equities of the former or of his interest in the premises.

33. TAX TITLE—*notice of tax sale—service and publication.* The statute requires the person in whose name the land is taxed shall be personally served with notice of the sale for taxes, if, upon diligent inquiry, he can be found in the county, and if he can not be so found, then the notice must be published in a newspaper three times. The inquiry and its result must precede the publication. Inquiry after the first publication is not sufficient. The statute does not permit the holder of the tax certificate to postpone his diligent inquiry until after he has published his notice.

34. SAME—*service of notice of sale on the occupant.* The statute, by requiring notice to be served upon every person in actual possession or occupancy of the land, never contemplated that the purchaser at the tax sale should himself create an occupancy, and then hand a notice to the occupant of his own creation. Such a service is not a compliance with the law. The possession or occupancy specified in the statute is one which is held adversely to the holder of the tax certificate.

35. Where the affidavits filed with the county clerk for the purpose of getting a tax deed, fail to show that the publication of the notice was preceded by the preliminary conditions required,—that is to say, they fail to show that before publication was made no person was in possession or occupancy of the land, or that there had been diligent inquiry for the persons in whose name the land was taxed and those interested therein,—the tax deed made under the same will be void.

36. NOTICE—*through agents—knowledge of facts.* The knowledge of an agent must be acquired during his agency, and in the course of the same transaction in which the principal's rights and liabilities arise, in order to affect the principal with notice, unless it is clear, from the evidence, that the information obtained by the agent in a former transaction is so precise and definite that it is or must be present to his mind and memory while engaged in the second transaction.

37. PURCHASER—*from one without notice by one having notice.* It is well settled that a purchaser with notice may get a good title from a *bona fide* purchaser without notice of prior equities.

38. SPECIFIC PERFORMANCE—*joint obligors—failure of jurisdiction as to one.* A decree for the specific performance of an agreement for the conveyance of the undivided half of a tract of land, made by two persons, each of whom held an undivided one-fourth, will not become invalid as to both the vendors, merely because it is subsequently shown that the court had no jurisdiction as to one of them, but the decree and conveyance thereunder will be good and binding as to the person over whom the court had jurisdiction, and will pass his undivided one-fourth of the land.

39. SAME—*decree, whether void for want of parties.* The proceedings in a bill by the vendee against his vendor for the specific performance of a contract of sale of land made in 1843, will not be void, as to the vendor's interest, merely because a subsequent grantee of the vendor, to whom the latter had conveyed in 1848, is not made a party, where the original vendee filing the bill had no knowledge of the conveyance to the second vendee ; and when the decree finds that such vendor has not conveyed any interest in the land to any one, a *bona fide* purchaser will have the right to rely upon the correctness of such finding.

40. RES JUDICATA—*judgment of Supreme Court.* Where an opinion of this court directs the decree of the circuit court to be reversed and the cause remanded without directions, what is said in such opinion in regard to the weight of evidence must be understood as applying to the facts disclosed in the record then under consideration, and only the legal principles therein announced are binding on the inferior court. In such case it by no means follows that other facts may not be proved within the principles announced or not inconsistent therewith, or that amendments may not be made which obviate objections to granting the relief sought or the allowance of a defense interposed.

41. SAME—*estoppel to interpose.* Where a complainant, after a reversal of a decree dismissing his bill, files a supplemental bill making new parties and introducing new facts, and making new issues and attacking the validity of a decree in a former suit for want of jurisdiction, and new evidence is introduced, never before brought forward on the main issue, he will thereby be estopped to say that the issues thereby tendered can not be considered by this court on the ground that such issues have already been decided.

42. ESTOPPEL—*to assert title by owner.* Where the equitable owner of an undivided half of a tract of land, holding under an unrecorded contract, by his acts represents the apparent legal owner as the real owner, and others deal with the latter as the owner, on the faith of his being the owner, the former will be estopped from setting up his interest in the land as against others acquiring rights from the apparent owner.

43. CLOUD ON TITLE—*who may file bill to remove.* A mortgagee may maintain a bill in equity to set aside a tax deed as a cloud on the title

to the mortgaged premises. The rule applies also when the mortgagee holds under a deed absolute in form.

44. PRACTICE IN SUPREME COURT—*affidavits—on motion for rehearing.* Affidavits of newly discovered evidence will not be considered in this court on petition for a rehearing, and, on motion, will be stricken from the files.

APPEAL from the Superior Court of Cook county; the Hon. HENRY M. SHEPARD, Judge, presiding.

Messrs. WOOLFOLK & BROWNING, for the appellants Wallace, Burton and Hansbrough:

The agreement between Hill and Perry & Henderson, for the prosecution of this suit, was clearly champertous. *Coleman* v. *Billings,* 89 Ill. 183; *Thompson* v. *Reynolds,* 73 id. 11.

Payment of taxes may be shown by parol. *Hinchman* v. *Whetstone,* 23 Ill. 185; *Elston* v. *Kennicott,* 46 id. 187; *Gage* v. *Hampton,* 127 id. 87; *Coleman* v. *Billings,* 89 id. 183.

A tax deed to unoccupied land, and seven years' payment of taxes thereunder, followed by subsequent possession, may be used as a sword as well as a shield. *McDuffee* v. *Sinnott,* 119 Ill. 449; *Gage* v. *Hampton,* 127 id. 87.

The court acquired actual jurisdiction over the unknown defendants, whether they proved to be Chambers and Benedict, or their unknown heirs. *Roderigos* v. *Savings Inst.* 63 N. Y. 460.

After seven years' absence the presumption of death arises, and if, after that period, Chambers and Benedict had been sued as living men, it would have been necessary to prove them alive. 1 Greenleaf on Evidence, sec. 41; Starkie on Evidence, 77, 78; Phillips on Evidence, 640, 641.

To give the court jurisdiction of unknown parties, all that is necessary is that it shall be made to appear that there are unknown parties, and that the notice required by the statute shall be published as to them. *Thornton* v. *Houtze,* 91 Ill. 200; *Finbaugh* v. *Hall,* 63 id. 81; *Harris* v. *Pullman,* 84 id. 20; *Pile* v. *McBratney,* 15 id. 314; Cooley's Const. Lim. 404.

The court having been clothed with power by the statute to pass upon the question of the validity of the notice to the unknown heirs and devisees of Chambers and Benedict, and having heard evidence and decided that such notice was proper, and assumed jurisdiction over their unknown heirs, such decision is binding upon every other court, unless it is reversed by a direct proceeding in the manner provided by the statute itself. Black on Judgments, sec. 273, note, and authorities cited; *Munroe* v. *People*, 102 Ill. 406. Also authorities cited in *Roderigos* v. *Savings Inst.* 63 N. Y. 460; *Walker* v. *Cronkite*, 40 Fed. Rep. 133; *Granger* v. *Clarke*, 22 Me. 128; *McCormick* v. *Sullivan*, 10 Wheat. 192; 2 Cowen & Hill's notes, 108-136, 196; 15 Am. Law Reg. 213, note.

Clearly, Chambers and Benedict were the real parties intended to be sued, and, in the eye of the law, were parties to the suit, if alive. Consequently the published notice to their unknown heirs and devisees was just as effective to give notice to and acquire jurisdiction over them as if against them personally, provided they themselves, or their acquaintances, would know, from reading the notice, that they were the parties intended. This is made the test by the authorities. *Fanning* v. *Kropfe*, 68 Iowa, 244; 61 id. 417; *Buchanan* v. *Roy's Lessee*, 2 Ohio St. 251; *Tate* v. *Hunter*, 3 Strobh. 138; Freeman on Judgments, 174; Phillips on Evidence, 324, notes.

All these facts as to notice bring into operation that other principle of law, that where the real party is sued by a wrong name the judgment will bind the party intended to be sued, when he has notice. Freeman on Judgments, sec. 154, and note 562; Phillips on Evidence, 812; *Pond* v. *Ennis*, 69 Ill. 341; *Hammond* v. *People*, 32 id. 447; *Guinard* v. *Heysinger*, 15 id. 288.

A purchaser is not bound to look beyond the decree when executed by a conveyance, if the facts necessary to give jurisdiction appear on the face of the proceedings, nor is he bound

to look further than the order of the court. *Voorhees* v. *Bank,* 10 Pet. 449; *Horshley* v. *Blackmoor,* 20 Iowa, 161; *Reeves* v. *Kennedy,* 43 Cal. 643; *Fergus* v. *Woodworth,* 44 Ill. 374; *Mulford* v. *Stalzenback,* 46 id. 303; *Dugan* v. *Follett,* 100 id. 582; *Robbins* v. *Moore,* 129 id. 30; *Dickerson* v. *Evans,* 84 id. 451; *Moore* v. *Hunter,* 1 Gilm. 317; *Spicer* v. *Robinson,* 73 Ill. 519.

It has long been a settled doctrine in this State, that if a third person, not a party to the suit, purchase *bona fide* at an execution sale under a judgment or decree not attacked but in force at the time, but which is afterward reversed for error, his title will not be affected by the reversal of the judgment. *Feaster* v. *Fleming,* 56 Ill. 457; *Hobson* v. *Ewan,* 62 id. 147; *Goudy* v. *Hall,* 36 id. 313; *Barlow* v. *Standford,* 82 id. 298; *Hannas* v. *Hannas,* 110 id. 53; *Thompson* v. *Frew,* 107 id. 478; *Conover* v. *Musgrave,* 68 id. 58.

The foregoing doctrine has been applied by our courts to a purchaser or investor at private sale who purchases or invests in reliance upon a judgment or decree while in force. The decree may be erroneous, and may be afterward set aside, but the title acquired thereunder will stand, provided *bona fide* purchasers without notice have invested in the property in reliance upon the decree. *Eldridge* v. *Walker,* 80 Ill. 270; *Wadhams* v. *Gay,* 73 id. 415; *Mulvey* v. *Gibbons,* 87 id. 367; *Horner* v. *Zimmerman,* 45 id. 14; *Guiteau* v. *Wisely,* 47 id. 433; *Whitman* v. *Fisher,* 74 id. 147.

A decree of court duly and legally obtained by publication, under the statute, can not be attacked directly, except within the time prescribed by statute,—in this case three years.

The deceee of 1870, being in a proceeding *in rem,* is just as valid, as far as the property is concerned, after three years, as if based on personal service. 1 Starr & Curtis' Stat. 402, sec. 19; *Lyon* v. *Robbins,* 46 Ill. 276; *Sale* v. *Fike,* 54 id. 292; *Martin* v. *Gilmore,* 72 id. 193; *Wellington* v. *Heermans,* 110 id. 564.

In a collateral action no evidence will be received, outside the record itself, to impeach the finding of the court as to its jurisdiction, or to show a want of jurisdiction where it has been assumed and the want of it does not appear in the record. *Mulvey* v. *Gibbons,* 87 Ill. 367; *Donlin* v. *Hettinger,* 57 id. 348; *Osgood* v. *Blackmore,* 59 id. 261; *Barnett* v. *Wolf,* 70 id. 76; *Searle* v. *Galbraith,* 73 id. 269; *Matthews* v. *Hoff,* 113 id. 90; *Harris* v. *Lester,* 80 id. 308; *Andrews* v. *Bernhardi,* 87 id. 365; *Logan* v. *Williams,* 76 id. 175.

When the assignee in bankruptcy declines to accept bankrupt property, it reverts back to the bankrupt himself. See 98 U. S. 20; 117 id. 405; *Smith* v. *Gordon,* 6 Law Rep. 313; *Brookfield* v. *Stevens,* 40 Ark. 366; *Boyd* v. *Oleary,* 82 Ind. 294; *Lefountaine* v. *Savings Bank,* 56 Vt. 332; *Amory* v. *Lawrence,* 3 Cliff. 524; *Glen* v. *Express Co.* 65 Md. 40; *Nash* v. *Simpson,* 78 Me. 142; *King* v. *Remington,* 38 Minn. 15; *Jones* v. *Byron,* 57 Texas, 43; Bump on Bankruptcy, (10th ed.) 507.

It devolved upon the bank to show affirmatively that it obtained Burton's equity of redemption fairly, by purchase, that no undue advantage was taken, and that it was based upon a new and adequate consideration. 1 Jones on Mortgages, sec. 340; 3 Pomeroy's Eq. sec. 1193; *Pugh* v. *Davis,* 96 U. S. 332; *Sutphen* v. *Cushman,* 35 Ill. 186; *Brown* v. *Gaffney,* 28 id. 149.

The facts that Burton received no consideration for signing the Stucky deed; that there was no settlement; that his mortgage was not canceled; that his notes were not delivered up; that the Kelsey note, amounting to $3600, held as collateral, was not returned to him,—show that the deed was a mere security for the mortgage. 1 Jones on Mortgages, secs. 340, 267; 3 Pomeroy's Eq. sec. 1193; *Sutphen* v. *Cushman,* 35 Ill. 186; *Bearss* v. *Ford,* 108 id. 16; *Ennor* v. *Thompson,* 46 id. 214; *Villa* v. *Rodriguez,* 12 Wall. 323; *Hyndman* v. *Hyndman,* 19 Vt. 9; *Bauggher* v. *Merryman,* 32 Md. 185; *Locke* v. *Palmer,* 26 Ala. 312.

Mr. William Garnett, Jr., and Mr. H. S. Mecartney, for the Louisville Banking Company:

Although the bank had, in 1884, bought the equity of redemption and received a conveyance from Burton, equity will keep the mortgage alive as to adverse or intermediate clauses. *Huebsch* v. *Scheel*, 81 Ill. 281; *Nat. Bank* v. *Cheeney*, 87 id. 602; *Dunphy* v. *Riddle*, 86 id. 22; *Christie* v. *Hale*, 46 id. 117; *Campbell* v. *Carter*, 14 id. 286; *Watson* v. *Gardner*, 119 id. 312; *Jarvis* v. *Frink*, 14 id. 396; *Insurance Co.* v. *Corn*, 89 id. 170; *Richardson* v. *Hockenhull*, 85 id. 124; *Lowman* v. *Lowman*, 118 id. 582; *Stanton* v. *Thompson*, 49 N. H. 272; *Young* v. *Hill*, 31 N. J. Eq. 429; 1 Jones on Mortgages, 873.

The seven year limitation commences to run from the first payment after receiving the color of title. *Iberg* v. *Webb*, 96 Ill. 415; *McConnel* v. *Konepel*, 46 id. 519; *Lyman* v. *Smilie*, 87 id. 259.

The tax titles were invalid. No diligent inquiry appears to have been made by McCaffrey in the time required by law.

Messrs. Crafts & Stevens, for the appellant John ·J. Mitchell:

The possession required by section 4 of the Limitation law may be by a tenant. *Martin* v. *Judd*, 81 Ill. 488.

It was not necessary that Mitchell's title should have been a perfect one,—the tax deed was good color of title. *Irving* v. *Brownell*, 11 Ill. 402; *Milliken* v. *Marlin*, 66 id. 13; *Whitney* v. *Stevens*, 89 id. 53; *Goewey* v. *Urig*, 18 id. 238; *Thomas* v. *Eckard*, 88 id. 593; *County of Piatt* v. *Goodell*, 97 id. 84; *Stubblefield* v. *Borders*, 92 id. 279; *Holloway* v. *Clark*, 27 id. 483; *Morrison* v. *Norman*, 47 id. 477.

Mr. Edmund S. Holbrook, and Mr. A. D. Eddy, for the appellees Perry & Henderson:

That the principle of *res judicata* applies to this case, see *Johnson* v. *Von Kettler*, 84 Ill. 315; *Hough* v. *Harvey*, id. 308;

*Hanna* v. *Read,* 102 id. 596 ; *Attorney General* v. *Railroad Co.* 112 id. 520 ; *Bailey* v. *Bailey,* 115 id. 551 ; *Cable* v. *Ellis,* 120 id. 136 ; *Osburn* v. *McCartney,* 121 id. 408 ; *Kitson* v. *Farwell,* 132 id. 327 ; *Harmon* v. *Auditor,* 123 id. 122 ; *Miller* v. *Pence,* 131 id. 122 ; *Culver* v. *Phelps,* 130 id. 218.

The adjudication will be sustained, though wrong. *Green* v. *Springfield,* 130 Ill. 515 ; *Stickney* v. *Goudy,* 132 id. 213 ; *Sanders* v. *Peck,* 131 id. 407.

What is allowable on trial after reversal without directions. Freeman on Judgments, sec. 276 ; *Moore* v. *Williams,* 132 Ill. 589.

A joint judgment, if void as to one is void as to all. Freeman on Judgments, sec. 136.

The admission that Chamber's heirs were not served with process (as they could not be) makes the decree void as to the heirs of Benedict. *Railroad Co.* v. *Easterly,* 89 Ill. 156 ; *Morris* v. *Hogle,* 37 id. 150 ; *Mack* v. *Brown,* 73 id. 295.

The tax deeds are invalid for several reasons. The judgment is void, as including illegal costs. *Combs* v. *Goff,* 127 Ill. 431 ; *Ogden* v. *Bemis,* 125 id. 105.

The affidavit of the service of notice is fatally defective. *Price* v. *England,* 109 Ill. 394 ; *Wallahan* v. *Ingersoll,* 117 id. 123 ; *Gage* v. *Stewart,* 127 id. 207.

The law of 1879, as to notice to unknown owners, is held to apply to sales made that year. The affidavit does not show any such notice. So the complainants here, whose deeds were on record from 1871, with suit in court, etc., are ignored, and have received no notice. *Mott* v. *Danville Seminary,* 129 Ill. 405.

True, the deed is good color of title ; but between the first payment of taxes under this deed, which was in August, 1882, and the commencement of suit against them, May 25, 1889, there are only six years and ten months. There must be full seven years. *Holbrook* v. *Debo,* 99 Ill. 372, and cases cited.

The defense of seven years' residence by the tenant, supposing Price has thus been their tenant, (which is denied,) what then? True, he would have been a resident for over seven years before suit, February 10, 1882, till February 10, 1889, seven years out two or three months before suit. But this is not the kind of title that can be used for such defense. A *prima facie* title by deed, deducible of record, etc., is required. This is not *Elston* v. *Kennicott*, 46 Ill. 188.

Mr. JUSTICE MAGRUDER delivered the opinion of the Court:

The complainants, Perry and Henderson, file this bill for the partition of forty acres of land, and claim to be the owners of an undivided half thereof. The defendants deny the ownership asserted by the complainants, and contend that they are themselves the owners of the whole of the forty acres. Therefore, *the first question to be determined is, whether the complainants own any interest in the land, and, if they do, what interest.*

It is not denied, that, on February 16, 1836, Isaac Cook, then holding the Government title to eighty acres, of which the tract of forty acres now in controversy is the south half, conveyed an undivided half of said eighty acres to Asa W. Chambers and Sheldon Benedict. The complainants claim title through a conveyance from Benedict to Chambers and three conveyances from Chambers to themselves.

Chambers and Benedict left Chicago in 1838. Benedict has never been seen or heard of but once since that time. It is said, that in the year 1848 he made a visit to Chambers while the latter was living in the State of Texas, but, after remaining with Chambers two or three weeks, he disappeared, and all further trace of him has been lost. He paid no taxes upon the property in question after he left Chicago, nor do the records of Cook County where these premises are located, show that he has ever made any conveyance of the land, or instituted any proceeding, or done any act indicating a claim of ownership, since the year 1838.

Chambers, according to his own testimony, was not in Chicago from 1838 to 1872. During a period of more than thirty years his whereabouts were unknown, and were only discovered in the year 1871, or thereabouts, after considerable search by a party acting for, or in concert with, the complainants. After his disappearance in 1838, he paid no taxes upon the land, nor did he or his grantees thereafter take any steps to assert title thereto until the filing of the bill in this case in July, 1873.

All the facts, however, in the present record, which tend to show laches by reason of delay in beginning suit, were before this Court in 1884, and again in 1888. (*Perry et al.* v. *Burton et al.* 111 Ill. 138; *Same* v. *Same*, 126 id. 599).

The only witness, who testifies that a deed was made by Benedict to Chambers, is Chambers himself. The latter swears that, after leaving Chicago in 1838, he remained about ten months in Georgetown, Vermilion County, Illinois; that he went to Texas in June, 1841, taking Mrs. Chambers with him; that he lived in Navarro County, Texas, from 1843 to 1872, about two miles from a little town called Mt. Pisgah containing 15 or 20 houses, thirteen miles from Corsicana, the principal town of the county, and about 110 miles from Bryant, Brazos County, where the complainants, Perry and Henderson, who are attorneys at law, reside; that he never saw Benedict, after leaving Chicago, until 1848; that, in November of that year, Benedict came to his house in Navarro County "flat broke and afoot," saying that he came through Galveston, and had been in New Orleans, and New York, and divers places; that he then sold to Chambers all his interest in this land and other lands in Illinois for $200.00, of which $75.00 was paid in cash, and for the balance he took a saddle horse; that Benedict then made a deed to Chambers of the land; that neither had any papers showing the description, but both remembered the description; that the deed was acknowledged before a justice of the peace, who is dead, and attested by two witnesses, who are both dead; that Benedict then rode away,

and Chambers has never seen or heard of him since, or of any of his relatives, if he had any; that Chambers never recorded the deed, but kept it for fourteen years on his place in Texas; that in 1862 he left home and deposited his papers in a trunk in the care of a daughter, then 25 years old; that the deed was lost during his absence, and he has never been able to find it.

The question as to the execution of the deed from Benedict to Chambers was passed upon by this Court in the decision made in 1884. (*Perry et al.* v. *Burton et al.* 111 Ill. 138). Counsel for defendants refer to many circumstances brought to light by the evidence taken since the first and second hearings of the cause, which are alleged to demonstrate the falsity of the testimony given by Chambers. We do not deem it necessary, however, to enter upon a discussion of this subject, as we have reached the conclusion for the reasons hereafter stated, that the defendants must be regarded as *bona fide* purchasers of the one fourth interest formerly held by Benedict without notice of the deed said to have been made by him to Chambers, and consequently are entitled to protection as against the latter deed.

Some time in 1871 or 1872 Chambers conveyed or attempted to convey all his interest in said tract of 80 acres, described as the E. $\frac{1}{2}$ N. E. $\frac{1}{4}$ Sec. 20, etc., and in other lands in Illinois, to the complainants, and received therefor the sum of only one hundred dollars. About the same time the complainants agreed with a real estate agent in Chicago to convey to him one half of such interest in the land as they should finally recover, upon condition that he should take possession of the property, employ attorneys, perfect the title, and pay all costs, expenses and attorneys' fees. We agree with counsel for the defendants, that the agreement in question was champertous and void, and could not be enforced as between the parties to it. (*Thompson* v. *Reynolds,* 73 Ill. 11; *Coleman* v. *Billings,* 89 id. 183). But we do not regard such agreement as material in the consideration of this case, as the present suit is

not between the complainants and the agent so employed by them. (*Torrence* v. *Shedd*, 112 Ill. 466; 3 Am. and Eng. Encyc. of Law, page 86).

It is not denied by the complainants, that, in the fall of 1844, Isaac Cook was the owner of the other undivided one half of the 80 acres which had not been conveyed in 1836 to Chambers and Benedict. The undivided half so conveyed to Chambers and Benedict was sold for taxes to Cook on November 28, 1842, and the Sheriff issued a tax deed therefor to him on December 9, 1844. It is claimed by the defendants, that Cook, holding under said tax deed and under the deed to him of the other half as color of title, paid all the taxes legally assessed upon the whole tract of 80 acres from 1844 to 1854, inclusive, while the land was vacant and unoccupied. We have heretofore passed upon the question of the payment of taxes by Cook under said tax deed, and have held that the payment of taxes by him during the period aforesaid was not established by proof. (*Perry et al.* v. *Burton et al.* 111 Ill. 138). Counsel claim, that there is now new evidence in the record, which shows that Cook did pay the taxes on the undivided half, conveyed to him by the tax deed, for a period of seven successive years between 1844 and 1854. We find no evidence whatever in the record, which shows that the 80 acres were vacant and unoccupied for seven successive years during the period from 1844 to 1854. Cook says nothing upon this subject, and the other witnesses, to whose testimony we have been referred, speak of the land as it was after 1854. In the absence of proof that the land was vacant and unoccupied, or that Cook was in possession of it during said period of seven years, it is immaterial, so far as the bar of the statute of limitations is concerned, whether the taxes were paid or not; and any discussion of the question, whether the defense based upon the payment of taxes under the tax deed to Cook has, or has not, become *res adjudicata* under the former decisions of this Court, would be unnecessary and fruitless.

In 1854 Cook sold the eighty acres to John W. Finnell and Richard C. Wintersmith for $4000.00, and afterwards, by warranty deed dated July 9, 1857, conveyed to them the 80 acres so sold.   On January 9, 1856, each undivided one half of said 80 acres, being the E. ½ N. E. ¼ sec. 20, etc., was separately sold for the taxes of 1855 to Frederick R. Wilson, and in pursuance of such sale the Sheriff afterwards executed a tax deed, dated August 23, 1859, to Wilson conveying to him the whole of the eighty acres.   Afterwards by deed dated April 26, 1865, Wilson conveyed the S. ½ of the E. ½ N. E. ¼ sec. 20, etc., being the 40 acres in controversy in this suit, to Finnell, and, by deed of the same date, conveyed the N. ½ of said E. ½, etc., to Wintersmith.   By way of further effecting a partition of the 80 acres between them, Wintersmith or his grantees, by deed dated April 24, 1869, conveyed to Finnell said south 40 acres, and, by deed of the same date, Finnell conveyed said north 40 acres to Wintersmith or his grantees.

On August 28, 1869, Isaac Cook and John W. Finnell, and Henry A. Montgomery and Abner Taylor, the two latter being grantees through mesne conveyances from said Wintersmith, filed a bill in the Superior Court of Chicago against The Unknown Heirs and Devisees of Asa W. Chambers, deceased, and The Unknown Heirs and Devisees of Sheldon Benedict, deceased, as defendants.   This bill set up, that Cook conveyed an undivided half of E. ½ N. E. ¼ of said section 20 to Chambers and Benedict, as above stated; that, by deed dated November 10, 1843, Norman B. Judd had deeded the other undivided half of said 80 acres to said Cook; that in November, 1843, Chambers and Benedict each owed more than $1000.00 to said Cook, and, in consideration of such indebtedness, executed an agreement in writing for the conveyance to him of their undivided half of said 80 acres; that the consideration therefor was the payment of said sums due from them respectively; that said contract had been lost or mislaid and had never been assigned by Cook; that neither Chambers

nor Benedict nor either of them had ever conveyed any part of said land to said Cook, or to any other person. The bill recites the sale for taxes in 1842, the tax deed to Cook in 1844, the exercise of control over the 80 acres by Cook from 1843 to 1857, the payment of taxes by him from 1842 to 1854, the sale for taxes in 1856, the tax deed to Wilson in 1859, the deed from Cook to Finnell and Wintersmith in 1857, the deeds in 1865 from Wilson to Finnell of the south 40 acres and to Wintersmith of the north 40 acres, the partition deeds in 1869 from the grantees of Wintersmith to Finnell of the south 40 acres and from the latter to the former of the north 40 acres; the bill alleges, that Chambers and Benedict had died intestate, and unmarried, and without children, and had been dead many years, and prays for a decree compelling the defendants to convey the S. $\frac{1}{2}$ of said E. $\frac{1}{2}$ to Finnell and the N. $\frac{1}{2}$ thereof to Montgomery and Taylor, and, in default thereof, that a master make such conveyance, and for summons. Appended to the bill was an affidavit, that the names of the heirs and devisees of Asa W. Chambers, deceased, and of the heirs and devisees of Sheldon Benedict, deceased, were unknown. Summons dated August 28, 1869, was issued to Cook County against the Unknown Heirs and Devisees of Asa W. Chambers, deceased, and the Unknown Heirs and Devisees of Sheldon Benedict, deceased, returnable on the first Monday of October, 1869, and was returned "not found." Proof of publication of notice to said defendants was filed November 29, 1869, the publisher's certificate showing publication for four successive weeks—four times in a certain newspaper—first on August 28 and last on September 18, 1869. On November 29, 1869, the Court entered an order, finding, that it appeared from proof filed, that publication had been made in the Chicago Evening Post, a newspaper published in Chicago, containing notice of the pendency of said suit, etc., "the first of which publications was more than sixty days before the commencement of this term of court," etc., and ordering that default be taken against

the defendants, and that the allegations of the bill be taken as confessed by them, and that the cause be referred to Ira Scott, Master in Chancery, to take proofs and report. On May 21, 1870, the Master made his report returning therewith the deeds named in the bill, or certified copies thereof, and also the deposition of Cook, wherein he testified that Chambers and Benedict were dead and had been dead for 15 or 20 years, that neither of them was ever married; that he had been unable to find any of their relatives living; that said Cook had re-acquired the title to said 80 acres from said Chambers and Benedict by contract or deed which he had been unable to find, and that no one had ever claimed said land since its purchase by Cook from Judd, and Chambers and Benedict, except Cook's grantees and those claiming under them. On May 21, 1870, the court rendered a decree, wherein, after reciting that the cause came on to be heard upon the bill, exhibits and testimony, and that the defendants, The Unknown Heirs and Devisees of Asa W. Chambers, deceased, and The Unknown Heirs and Devisees of Sheldon Benedict, deceased, "although duly notified and warned," failed to appear and plead, it was ordered that the bill be taken for confessed, and, after finding that the material averments thereof were fully proven, it was further decreed, that the complainants therein be quieted in their title to and possession of said 80 acres, and that the defendants "and all others" be forever enjoined from setting up any claim or title to said premises, or any part thereof, adverse to the claim and title of the respective complainants therein, and that the defendants within five days execute a deed to complainants, Montgomery and Taylor, conveying to them said $N. \frac{1}{2}$, and a deed to the complainant, Finnell, conveying to him said $S. \frac{1}{2}$, etc., and, in default of their so doing, that said Master make said conveyances for said defendants.

In pursuance of said decree, Ira Scott, Master of said Court, executed a deed, dated June 14, 1870, and recorded June 23,

1870, conveying the S. ½ of the E. ½ of the N. E. ¼ of said section 20, etc., to said John W. Finnell; and also, by deed of same date and recorded on June 23, 1870, conveyed the N. ½ of said E. ½, etc., to said Montgomery and Taylor.

On February 23, 1871, Finnell sold said south 40 acres to George G. Street for $12,000.00, and conveyed the same to him by warranty deed of that date, which was recorded before October 9, 1871. Street paid $3000.00 in cash upon said purchase, and, to secure the remaining $9000.00 of the purchase money, executed to Samuel M. Moore, as trustee, four trust deeds, dated February 21, 1871, and recorded March 23, 1871, one on the N. E. 10 acres of said south 40 acres to secure a note for $2250.00 payable in one year, one on the N. W. 10 acres thereof to secure a note for $2250.00 payable in two years, one on the S. E. 10 acres to secure a note for $2250.00 payable in 3 years, and one on the S. W. 10 acres to secure 3 notes, each for $750.00, payable respectively in 1, 2 and 3 years, all said notes signed by said Street and payable to the order of said Finnell.

On March 1, 1871, Street sold said 40 acres to William Hansbrough for $18,000.00, and conveyed the same to him by a warrranty deed, dated March 1, 1871, and recorded March 31, 1871, subject to said incumbrances of $9000.00, which said Hansbrough assumed and agreed to pay. Hansbrough bought the property for himself and George W. Burton, and, by warranty deed dated January 30, 1872, and recorded January 8, 1873, conveyed the same for an expressed consideration of $18,000.00 to said Burton, who also assumed the payment of said incumbrances.

On October 3, 1871, before the maturity of said notes, Charles G. Wallace bought all of said notes and trust deeds from said Finnell, and paid therefor $8600.00 in money. Burton paid the two notes payable in one year, one for $2250.00 and one for $750.00, and said N. E. 10 acres have been released from the lien of the trust deed thereon.

In 1877 Burton executed upon the 40 acres a mortgage which was assigned in 1878 to the Louisville Banking Company, one of the appellants herein. In 1878 Burton became bankrupt and an assignee in bankruptcy of his estate was appointed. During this litigation the property has been sold for taxes, and John J. Mitchell, also one of the appellants, holds tax deeds upon the property. For the present, we postpone the consideration of all questions as to the bankruptcy of Burton, and as to the rights of The Louisville Banking Company, and of Mitchell.

Wallace, one of the defendants below and one of the appellants here, is the owner of the unpaid notes secured by three of said trust deeds, together with the interest thereon. He claims that he bought the same in good faith relying upon the validity of said decree of May 21, 1870, and of the master's deed made in pursuance thereof. Burton and Hansbrough, defendants below and appellants here, claim that they and their grantor, Street, bought the 40 acres in good faith relying upon said decree, and that they are *bona fide* purchasers for value without notice of the claim of complainants, or of their grantor, Chambers.

We are thus brought to the consideration of the question, whether parties purchasing in good faith and in reliance upon the validity of such a proceeding against Unknown Heirs and Devisees as is above set forth, are entitled to be protected in their purchases.

In support of their contention that the Superior Court of Chicago acquired jurisdiction in the proceeding of 1869 over The Unknown Heirs and Devisees of Asa W. Chambers, deceased, counsel for appellants assert, in the first place, that the Chambers, from whom the complainants derive their title, was an impostor, and is not sufficiently identified by the evidence as being the same Asa W. Chambers, who lived in Chicago in 1836, to overcome the presumption of death arising from absence for several periods of seven years each, and to

overcome the judicial finding of the fact of his death made in 1869 and 1870, as above set forth. Undoubtedly there are some circumstances, which leave the mind in doubt upon this question of identity. John C. Haines and Fernando Jones swear, that they knew Chambers and Benedict well when the latter were in Chicago in 1836 and 1838; that Chambers was a young man not more than 25 years old, and was an unmarried man; that he had no family and slept in his store, etc. The grantor of complainants was in Chicago in 1872 or 1873, and gave his deposition in that city in September, 1874. He seems to have kept aloof from all of the old citizens, except one, who knew the Chambers of 1836 and 1838. His board, while he was here, was paid by the real estate agent already mentioned. He states, that he was engaged at that time in peddling blueing for washing purposes. He says that, while he lived in Chicago, he had a wife and children, and that one of his daughters was married in Danville before he went to Texas. Three or four witnesses swear that the reputation of the Chambers, who lived in Texas in 1849 and 1862, for truth and veracity was bad, and that they would not believe him under oath. Several testify, that Chambers of Texas signed his name Asa Chambers, and was not known as Asa W. Chambers. There are many inconsistencies in the account, which the grantor of complainants gives of himself and of the transactions of which he speaks. If this matter depended upon his testimony alone, its inherent improbability, and its contradiction by Haines and Jones, would leave his identity with the original grantee of Cook unproven. But Haines and Jones did not see him when he was in Chicago in 1872 and 1874. On the other hand, Mark Beaubien, an old settler in Cook County, swears that he knew the Chambers who was here in 1836, and that the Chambers here in 1874 was the same man. The Chambers, who testified in this case, boarded with Beaubien in 1874, and the latter swears, that he recognized him as the man who had formerly boarded with him in 1836 or

1837. While there is some evidence tending to show that Beaubien was a very credulous man, there is none that successfully impeaches his truthfulness. We think, upon the whole, that his testimony must be held to determine the question of identity in favor of the position taken by the complainants upon this subject.

But appellants contend, in the second place, that, even if the grantor of complainants be identified as the grantee of Cook, yet the rights of Chambers were cut off as against them by the decree of 1870. Their position is, that the Superior Court of Chicago was a court of general jurisdiction; that it had jurisdiction of the subject matter; that absence from the domicile for a period of seven years without being heard from creates a presumption of death; that Chambers had been absent and not heard from for thirty one years when the suit of 1869 was begun; that the Court made a decree upon proofs taken finding him to be dead; that proper publication was made as to his heirs; that complainants were *bona fide* purchasers for value without notice, and were not bound to look beyond the decree when executed by a master's deed, inasmuch as the facts necessary to give jurisdiction appeared upon the face of the proceedings; that the decree cannot be attacked collaterally, etc. There is force in these contentions when applied to the Unknown Heirs and Devisees of Sheldon Benedict, deceased, as will be seen hereafter, but they have no application to Chambers. According to the testimony of Beaubien, as it appears in this record, Chambers was alive when the suit was begun in 1869, and when the decree of 1870 was rendered, and when the present bill was filed in 1873. He was not a party to the suit of 1869. The persons made parties as his Unknown Heirs and Devisees were not then in existence. There were no such persons. The Court had no jurisdiction over him, and the decree was absolutely void as to his one fourth interest obtained from Cook in 1836. In authorizing the heirs of a deceased person, who has been in-

terested in the subject matter, to be made parties under the name of Unknown Heirs when their names are unknown, the statute presupposes that the death of such person is an established fact; it was never designed to cut off the known rights of such a person while in life, even as against innocent purchasers for value; it has reference to deceased persons and not to live persons.

In *Thomas* v. *The People*, 107 Ill. 517, where the proceeds of a sale in partition came to the hands of a master in chancery, and, prior thereto, administration had been granted upon the estate of one of the heirs upon the hypothesis that he was dead because he had been absent and not heard from for more than seven years, the master paid to the administrator the portion of the proceeds belonging to such absent heir; afterwards the person supposed to be dead turned out to be alive; and it was *held,* that the grant of administration and all acts done thereunder were void, that the probate court had no jurisdiction except over the estates of deceased persons, that the money was improperly paid out, and that the interested party, who had returned alive, was entitled to recover back his money from the master. We think that the doctrine of the *Thomas* case is applicable to the case at bar so far as Chambers is concerned. We are, therefore, of the opinion, that the decree of May 21, 1870, and the master's deed of June 14, 1870, did not have the effect of depriving Chambers of the one fourth interest, shown by the records to have been conveyed to him in 1836.

The proceeding of 1869 must be regarded as a proceeding against the Unknown Heirs and Devisees of Sheldon Benedict alone, and the question arises whether it was valid as to them. There is no evidence in the record, that Benedict was alive when that proceeding was instituted, or when the decree therein was entered. He had been absent from Cook County and had not been heard from in that county for 31 years. If he was alive in 1848, he had not been heard from in 1869 for

21 years. Acting upon the presumption of his death and upon the evidence of Cook that he was dead, the decree of 1870 found the fact of his death to be established. The complainants have introduced no proof to contradict the truth of such finding. In their original bill filed in this cause on July 18, 1873, they alleged that Benedict was dead, and, after filing the affidavit required by the statute, made his Unknown Heirs and Devisees parties defendant.

We see no reason why the court did not obtain jurisdiction over the Unknown Heirs and Devisees of Sheldon Benedict, deceased, by the proceeding of 1869 as above set forth. Inasmuch as said heirs and devisees were notified by publication only, they had a right to come in at any time within three years after the entry of the decree, and open it, and answer the bill. It is true, that such a decree does not become final until after the lapse of three years, and that parties, purchasing during that time, do so subject to the contingency that the decree may be set aside. (*Lyon* v. *Robbins,* 46 Ill. 276; *Southern Bank of St. Louis* v. *Humphreys,* 47 id. 227). But when the three years have passed and no steps have been taken by the defendants to open it, it has the same effect as though there had been personal service. (*Caswell* v. *Caswell,* 120 Ill. 377). Although, in the present case, Street and Hansbrough and Burton and Wallace acquired their interests within three years after the entry of the decree of May 21, 1870, yet none of the heirs or devisees of Benedict appeared between that date and May 21, 1873, for the purpose of opening the decree and answering the bill. The decree became final on May 21, 1873, and the rights of said appellants became thereby fixed and relieved of their conditional character. The bill of the complainants in this case, not having been filed until July 18, 1873, was not filed until more than three years had passed not only after the entry of the decree, but after the execution and recording of the Master's deed to Finnell. It makes no difference, that said bill was filed

within less than two months after May 21, 1873. The evidence tends to show, that the efforts made by the agent of the complainants to find Chambers and get a conveyance from him were prompted by the beginning of the chancery suit in 1869, and by the publication of the notice to Unknown Heirs, etc.

Neither Finnell, nor the above named appellants who hold under him, had any notice whatever that Benedict had made a deed to Chambers until the filing of the original bill in this cause. The allegations of that bill made it known on July 18, 1873, for the first time, that such a deed, of which the records gave no information, had been executed and lost. The first two deeds made by Chambers to the complainants gave no notice of the execution of a deed by Benedict to Chambers. They both bear date November 20, 1871; one was recorded on January 30, 1872, and the other on February 16, 1872. By the former, Chambers conveyed to Perry and Henderson "all of the equal and undivided one half part," not of the E. ½ of the N. E. ¼, etc., but "of the N. E. ¼ of section 20," etc., and omitted to state in what county and State said N. E. ¼ was located; by the latter, Chambers conveyed to Perry and Henderson "an undivided one half part of all the pieces, parcels or lots of land which I own or have any title to" in Cook County, or in any part of Illinois, but failed therein to specifically describe any particular land. The third deed made by Chambers to Perry and Henderson, which recites that it is made to correct the mistake in the first deed of omitting the words "In Cook County and State of Illinois," bears date July 5, 1873, and, although it is referred to in the original bill in connection with the other two deeds, it was not recorded until September 9, 1890.

Which title to the undivided one fourth interest, conveyed by Cook to Benedict in 1836, is the better title: that of appellants, derived from Finnell through his Master's deed of June 14, 1870, and purchased in good faith for valuable consideration without notice of any adverse interest, or that of com-

7—146 ILL.

plainants based upon the lost deed of Benedict to Chambers brought to light for the first time on July 18, 1873?

The statute provides, that "all deeds, mortgages and other instruments of writing which are (required) authorized to be recorded, shall take effect and be in force from and after filing the same for record, and not before, as to all creditors and subsequent purchasers without notice; and all such deeds and title papers shall be adjudged void as to all such creditors and subsequent purchasers, without notice, until the same shall be filed for record." If Benedict had been alive in June, 1873, and Finnell had then purchased his one fourth interest from him for a valuable consideration, and in good faith, and without notice of any previous conveyance thereof, and had recorded his deed on June 23, 1873, Finnell would certainly have held the interest as against the unrecorded and lost deed previously made by Benedict to Chambers in 1848, and not heard of by Finnell until July 18, 1873. Although the legal title passes by the first deed which is not recorded, yet, by force of the recording laws, it is postponed in favor of a subsequent deed to a *bona fide* purchaser, which is recorded. We have held, that this rule applies as well to *bona fide* subsequent purchasers from heirs, as to purchasers from the ancestor. In *Kennedy* v. *Northup,* 15 Ill. 148, we said: "During the lifetime of the grantor in an unrecorded deed, the apparent title is in him; and he who purchases in good faith that apparent title, it is conceded on all hands, is protected by the statute. After the death of such original grantor, the apparent legal title is in the heir, and the policy of the law, which is to make patent all legal titles to land, so far as practicable, that strangers may safely purchase, equally requires that the *bona fide* purchaser from the heir should be protected." If, therefore, Finnell had purchased said interest in good faith from the heirs of Benedict in June, 1873, and had recorded his deed in June, 1873, he would have been protected against the unrecorded deed made in 1848. But when such heirs are un-

known, why should not a subsequent purchaser, who acquires their interests in good faith and without notice through a statutory proceeding against Unknown Heirs, be equally protected against the unrecorded deed? A deed from the heirs themselves no more effectually disposes of their interests, than a deed executed for them by a master in chancery, under the orders of a court which has acquired jurisdiction over them. It has been held that the subsequent purchasers, who are protected against unrecorded conveyances, include purchasers at judicial sales as well as other sales. (*Webber* v. *Clark*, 136 Ill. 256). In principle and reason, these appellants, as purchasers from the grantee in the master's deed executed under a judicial proceeding, occupy a position somewhat similar to that of the purchaser at a judicial sale.

Section 7 of the Chancery Act is as follows: "In all suits in chancery and suits to obtain title to lands, in any of the courts of this State, if there be persons interested in the same whose names are unknown, it shall be lawful to make such persons parties to such suits or proceedings by the name and description of unknown owners or unknown heirs or devisees of any deceased person, who may have been interested in the subject matter of the suit previous to his or her death; but in all such cases an affidavit shall be filed by the party desiring to make any unknown person a party, stating that the names of such persons are unknown. The process shall be issued against all parties by the name and description given as aforesaid, and notice given by publication, as required by this Act, shall be sufficient to authorize the court to hear and determine the suit as though all the parties had been sued by their proper names." (1 Starr & Cur. Stat. page 395). Section 43 of the same Act is as follows: "All decrees, orders, judgments and proceedings made or had with respect to unknown persons shall have the same effect, and be as binding and conclusive upon them, as though such suit or proceeding had been instituted against them by their proper names." (Idem, page 412).

The statute requires that the deceased person should be one, who was interested in the subject matter of the suit previous to his death. (*Pile* v. *McBratney*, 15 Ill. 314). The records showed, when the suit of 1869 was begun, that Benedict was the only person who had been interested in the one undivided fourth conveyed to him in 1836, except those holding tax titles. There was nothing to inform the complainants in the suit, that Chambers had any interest in such undivided one fourth, or that there were unknown persons interested therein other than Benedict's heirs. In *Pile* v. *McBratney, supra,* the nature and effect of a proceeding precisely like the suit of 1869, were fully discussed, and it was there said : "The court having acquired jurisdiction of the case and passed upon the rights of the parties, the decree was binding on the heirs of Mastin. The deed of the commissioner transferred all their interest in the land." When all persons known to have any interest in the land, or shown by the records to have any interest, are made parties, the proceeding would be useless, if, after it has become final, persons claiming to hold secret interests, unrecorded and unsuspected even, can come in and set the decree aside. Such a doctrine would open wide the door to fraud and perjury. Speculators would be tempted to swear to lost deeds or other instruments, as having been executed to them by parties to such proceedings, for the express purpose of declaring the decree invalid for want of jurisdiction over themselves. Thus the very object of the statute would be defeated. While the decree of May 21, 1870, was invalid so far as it operated to deprive Chambers of the one fourth interest shown by the records to have been conveyed to him in 1836, we cannot regard it as invalid, so far as it affected the secret interest claimed to have been obtained by him through the lost deed of 1848. The apparent title to the latter interest stood in Benedict or his heirs. "Where a deed is not recorded, the title is apparently still in the grantor, and the law authorizes purchasers who are ignorant of the conveyance, to deal with him as the real owner.

In case of his death, the heir becomes the apparent owner of the legal title; and it is equally as important, and equally as just, that the public may be allowed to deal with him as the real owner." *(Kennedy* v. *Northup, supra).* When the facts authorize a statutory proceeding against the unknown heirs holding the apparent title, the prosecution of such a proceeding to the end, and the securement of a title thereunder, amount to a dealing with such heirs as the real owners, just as much as would be a purchase from heirs whose names are known.

The bill of 1869 was to a large extent a bill for the specific performance of a contract to convey land. Cook, and his grantees, alleged therein that Chambers and Benedict executed a written agreement in 1843 to convey their interests in the 80 acres to Cook. The court found that allegation to be true, and ordered the defendants to make deeds to carry out the agreement, or, upon their default, that the master do so. Here was a judicial finding, that Cook acquired an interest in Benedict's one fourth before the deed of 1848 was made. The appellants, purchasing in good faith and without notice, had a right to rely upon that decree and the deed thereunder as passing Benedict's title. The court had jurisdiction of the parties, the Unknown Heirs of Benedict, deceased, and of the subject matter, the specific performance of a contract to convey land.

Counsel for appellees charge, that the proceeding of 1869 was a fraud perpetrated upon the court by Cook, and that no such contract of sale as is therein set up ever existed. The proof does not sustain this charge. Chambers, it is true, swears that he owed Cook nothing when he left here in 1838, and that he thinks Benedict owed him nothing. Cook, however, swore to the contrary in the suit of 1869, and the court found his evidence to be true; and not only so, but he swears to the same thing in his testimony taken in this case in 1882. But if it were true, that Cook was guilty of the fraud charged against him, it was not such a fraud as goes to the jurisdic-

tion of the court rendering the decree of 1870, and, therefore, is unavailable in a collateral attack upon the proceeding of 1869, as against innocent purchasers from the grantee in the master's deed. There are two kinds of fraud as applied to this subject—fraud in obtaining a decree by false evidence, and fraud which gives a court colorable jurisdiction over the defendant's person. In case of a fraud of the former kind, a decree cannot be impeached in a separate and independent proceeding, though it is otherwise in the case of a fraud of the latter kind. (*Caswell* v. *Caswell*, 120 Ill. 377).

Counsel for appellees contend that the contract set up in the bill of 1869 was a joint contract for the conveyance of an undivided one half of the 80 acres by Chambers and Benedict together, and that, when jurisdiction over Chambers failed, there was no jurisdiction to enforce the contract against Benedict alone for the conveyance of his one fourth interest. We do not concur in this position. The deed made by Cook in 1836 conveyed to Benedict one fourth and to Chambers one fourth, and each could perform the contract as to his own interest only, and not as to the interest of the other. Hence, we see no reason why the master's deed to Finnell did not pass Benedict's one fourth, though it failed to pass the one fourth belonging to Chambers. Freeman in his work on Cotenancy and Partition (sec. 209) says: "An agreement to convey entered into by several co-tenants, by which they stipulate that they will give a good and sufficient warranty deed, etc., does not require either to warrant the title of the others. It is complied with, if each makes a separate deed of his moiety containing the stipulated covenant, or if all join in a deed, in which each grantor warrants his share, but not that of his co-grantor." (*Coe* v. *Harahan,* 8 Gray, 198).

Viewing the contract as one between Benedict, vendor, and Cook, vendee, for the sale of one fourth of the land, and viewing the bill of 1869 as a bill brought by the vendee against the vendor for the specific performance of a contract made in 1843,

we cannot see how the proceeding can be void as to the vendor's interest, merely because a subsequent grantee of the vendor, to whom the latter conveyed in 1848, was not made a party, it being true that the original vendee filing the bill knew nothing about the conveyance to such second vendee. The bill alleged, that Benedict had not conveyed any part of his interest in said land to any person, and the decree found that allegation to be true. The appellants, as *bona fide* purchasers from the master's grantee, had a right to rely upon the correctness of the finding. In case of a common bill for the specific performance of a contract of sale of real estate, the only proper parties in general are the parties to the contract itself. (Story's Eq. Pl. sec. 226 b; *Gibbs* v. *Blackwell,* 37 Ill. 191). In a case before Shadwell, V. C., where the vendor sold the same property twice over, and the bill was brought by the first purchaser against the vendor and the second purchaser, it was dismissed (without costs) as against the latter, though specific performance was decreed against the original contractor; this was affirmed by Lord Lyndhurst, etc. (Fry on Spec. Perf.—3d ed.—sec. 144).

Counsel for appellees contend that all questions as to the chancery suit of 1869 are *res adjudicata* under the former decisions of this Court made in this cause. We do not think that such is the effect of said decisions. The case was first tried before the Superior Court of Cook County in 1883. Upon the hearing then had, the Superior Court dismissed the bill of the complainants for want of equity. An appeal was taken to this Court, and, in an opinion filed on September 27, 1884, we reversed said decree of dismissal, and remanded the cause generally without directions. (111 Ill. 138). The case was again tried before the Superior Court in May, 1887, and a decree was entered by that court on August 2, 1887, again dismissing the bill of the complainants for want of equity. A second appeal was taken to this Court, and, in an opinion filed November 15, 1888, we reversed the second decree of dis-

missal, and again remanded the cause without directions. (126 Ill. 599).

An examination of the opinions of 1884 and 1888 will show, that there was no discussion in regard to the proceeding of 1869, and not even a reference to it. The questions of law and the questions of fact there discussed were other than those which relate to the suit begun in 1869 and the decree therein entered and the master's deed executed in pursuance thereof. When the opinion of this Court directs the decree of the Circuit Court to be reversed and the cause to be remanded without directions, what is said in such opinion in regard to the weight of evidence must be understood as applying only to the facts disclosed in the record then under consideration; and only the legal principles therein announced are binding upon the inferior Court. (*Shinn* v. *Shinn,* 15 Brad. 141). In such case, it by no means follows, that other facts may not be proved within the principles announced, or not inconsistent therewith, or that amendments may not be made which obviate objections to granting the relief sought, or to the allowance of a defense interposed. (*Cable* v. *Ellis,* 120 Ill. 136; *Manf. Co.* v. *Wire Fence Co.* 119 id. 30; *Green* v. *City of Springfield,* 130 id. 515.)

It is true, that some reference was made to the suit of 1869 in the original pleadings. But since the cause was last remanded, new pleadings have been filed and the old pleadings have been amended by both sides, and new and more extended averments have been therein made as to said suit. It appears clearly from the evidence of three witnesses, Finnell, Browning and Jones, and from former briefs of counsel as testified to by the counsel for appellees, that no proper and legitimate evidence as to said suit was, or could have been introduced upon the hearings of 1883 and 1887. Neither party then had an abstract of title, made in the ordinary course of business before the destruction of the records in Cook County by the great fire of October, 1871, which showed fully all the pro-

ceedings in said suit. In 1887 the legislature passed an Act amending what is known as the Burnt Records Act. Said Amendatory Act went into force on July 1, 1887, and it was not until after it went into force that the defendants were able to introduce a letter press copy, and extracts and minutes from the destroyed records in the possession of abstract makers, showing the return of the summons, and the publication of notice against Unknown Owners, and other facts in said suit of 1869. Without the evidence made competent by the Act of 1887, there was no way of proving that the Court acquired jurisdiction in said suit over the Unknown Heirs of Benedict.

In addition to this, the complainants, Perry and Henderson, upon the reinstatement of the cause in the lower court after the reversal of 1888, not only filed in May, 1889, a supplemental bill referring to the previous pleadings in the cause and making new parties, but as late as November 20, 1890, they filed an amended supplemental bill, attacking the validity of the proceeding of 1869 upon specific grounds, and setting up reasons why they entered no motion therein during the three years after the rendition of the decree of May, 1870, and also giving reasons, why the defendants should not be allowed to rely upon the same for protection to themselves as *bona fide* purchasers. Answers were filed by the defendants setting up their reliance upon said suit. The amended supplemental bill of November 20, 1890, and the answers thereto made a direct issue upon the validity of the proceeding of 1869; and new evidence, never before brought forward, was introduced in support of this issue. Having filed said amended supplemental bill, the appellees are estopped from claiming that the issue thereby tendered cannot now be considered.

For the reasons hereinbefore set forth, we are of the opinion that the appellants, holding under Finnell, the grantee in said master's deed, have obtained good title to Benedict's one fourth interest, as against Chambers, the grantee in the un-

recorded deed of 1848.    It follows, that the complainants were only entitled to be regarded as owners of an undivided one fourth part of said south 40 acres; and, therefore, the decree of the Court below, holding them to be the owners of an undivided one half part thereof, is erroneous.

The other questions in the case have reference to the rights of the defendants, as among themselves, in the remaining three fourths of the tract after awarding one fourth thereof to Perry and Henderson.

*As to the Wallace notes and trust deeds.*    Wallace has filed cross-bills asking for a foreclosure of the incumbrances held by him.    The court below found, that the legal title to the one half not belonging to the complainants was vested in The Louisville Banking Company in trust for Burton, as hereinafter explained; and that, as one half of the $12,000.00 of purchase money agreed to be paid by Street to Finnell had been paid as above stated, and the other half with interest thereon was represented by the notes specified in the cross-bill and owned by Wallace, and as Finnell conveyed the whole 40 acres to Street with full covenants of warranty, but in fact thereby conveyed the title to only one half of said property, therefore said Wallace could not enforce his trust deeds against the undivided half so decreed to be held by the company as trustee, etc., and said trust deeds were void, as against the rights of Burton and Hansbrough and said Company, by reason of such failure of title to one half of said land; and the court decreed, not only that the half held by it to be the property of complainants was free from the lien of said trust deeds, but that said Wallace had no claim whatever upon any portion of said tract of 40 acres.    Burton and Hansbrough elected to assert their equities against Wallace.    Although one of the errors assigned by Wallace is, that the court below refused to enforce the lien of his trust deeds, yet his counsel do not present any argument in this court against the finding of the decree in this respect.    Hence, we conclude that they have

abandoned their assignment of error. The deeds from Finnell to Street, and from Street to Hansbrough, and from Hansbrough to Burton, all contained full covenants of warranty. If the grantees had paid one half the purchase money, and received title to only one half the land, they could certainly set up the failure of the warranty as to the other half of the land, as a bar to the enforcement by Finnell of a suit to foreclose the notes and trust deeds given for the other half of the purchase money. As Wallace, purchaser of the notes from Finnell, is seeking to enforce them by foreclosure in a court of equity, said grantees could set up the same defense against him as against Finnell, the original payee. We are, therefore, inclined to think, that the decree was correct in this particular, upon the hypothesis that the grantees of Finnell had lost title to one half of the land. As, however, we hold that the title to one fourth only of the tract has failed, Wallace is entitled to enforce his notes and trust deeds to the amount of $3000.00, with interest, according to the terms of the notes. To the extent thus indicated the decree below is erroneous.

*As to the interest of the Louisville Banking Company.* The controversy between the Louisville Banking Company and Burton is, whether Burton still owns the equity of redemption subject to the Company's mortgage, or whether the Company is the owner of the fee of the property to the exclusion of any right to redeem on the part of Burton. The determination of this question requires a statement of the facts, out of which the controversy grows.

On January 15, 1877, Burton and wife of Jefferson County, Kentucky, executed to R. K. White, of the same county, a mortgage upon said south 40 acres, and 80 acres of land in Morgan County, Illinois, to secure three notes for $6000.00, $4500.00 and $1500.00 respectively, payable to the Louisville Banking Company, "and all renewals or extensions of the same in whole or in part, and save the said White who is endorser and security thereon from all loss, cost or damage;"

the mortgage containing a provision that, "if, during the time said White holds the title to the said premises, he should be compelled to pay taxes or assessments or other sums on account of being title holder thereof, the same, with interest and costs, shall constitute a lien upon the premises aforesaid and must be paid by said Burton before he can require reconveyance of said premises." This mortgage was recorded in Cook County on January 18, 1877, and in Morgan County on February 19, 1877. Afterwards, by a written instrument of transfer, dated August 8, 1878, and signed by both Burton and White, the said Burton and White assigned to the Louisville Banking Company the full benefit of all their interest, right and title in and to said mortgage, and therein agreed that said Banking Company should be and was thereby substituted to all the rights then held by said White under said mortgage, "the same," as is stated in said written instrument, "having been made for the security of certain debts named therein, and are in a supplementary paper of date 24th day of October, 1877, and to indemnify the said White as the surety of said Burton in said debts owing by said Burton to said Banking Company, and we hereby agree to make all other and further transfers, assignments and writings, as may be necessary to carry into full effect the true intent and meaning hereof." The amount of the indebtedness named in said mortgage was thereafter reduced, and new notes were executed to said Banking Company by Burton and White in place of said three notes, towit: one for $4500.00, dated January 11, 1878, and one for $5970.00, dated April 24, 1878, both payable four months after date to the order of said Company, the latter reciting upon its face a pledge by Burton, as security therefor of two notes against P. G. Kelsey for $1219.00 and $1236.74, and one note against Kelsey and Giles for $1196.74, etc. It appears from a credit on the note for $4500.00, that there was pledged, as collateral security there-

for, a claim against one R. C. Kerr, upon which $1171.50 was realized on May 18, 1881.

Neither the mortgage aforesaid, nor the assignment thereof, was under seal, but Burton has never contested the same, nor denied his liability thereon. On August 26, 1878, Burton filed his petition in bankruptcy in the United States District Court at Louisville, Kentucky, and was adjudged a bankrupt on August 28, 1878; on September 13, 1878, the creditors met and selected W. W. Gardner, as assignee; and, on the same day, the register in bankruptcy made an assignment to said assignee of all the property and effects of the bankrupt. On April 24, 1879, Burton was discharged from bankruptcy upon his own application, and upon his filing the assent in writing of one fourth in number and one third in value of his creditors to whom he was liable as principal debtor, and who had filed their claims. On June 26, 1880, Gardner was discharged as assignee of the bankrupt estate. His final accounts were filed on June 26, 1880, and found to be correct, and, in his sworn report filed with the register on that day, he says: "The bankrupt sets forth in his schedule, filed in this court, that he was the owner of a large amount of real estate lying in various States, all of which appears to be encumbered largely in excess of its value, and is beyond the control of this assignee. * * * This assignee is of the opinion, that in no event can there be anything realized from the estate for the unsecured creditors. Hence he asks that his accounts be audited, and that he be discharged from all further liability on account of said trust."

Gardner died in November, 1882, more than two years after his discharge as assignee. But it appears that an attorney in Louisville went before said District Court on December 15, 1882, and, upon his motion and announcement of the death of Gardner, an order was entered, "that Harry Stucky be and he is hereby appointed assignee in bankruptcy of the estate of" George W. Burton. The records and files of the said District

Court show nothing further as to said Stucky except the motion and order above named. No order was ever entered directing said Stucky to make sale of any of the property of the bankrupt, or confirming any such sale after it was made. By deed, dated January 14, 1884, and recorded January 21, 1884, Stucky, as assignee of Burton, and Burton and wife, united in a deed conveying said 40 acres in Cook County, and said 80 acres in Morgan County, to the Louisville Banking Company, reciting therein the bankruptcy of Burton, the appointment of Gardner and assignment to him by the register and his death, and the appointment of Stucky, and reciting further that all the right, title and interest of Gardner, as assignee, became vested in Stucky, as assignee; that Stucky had advertised notice of sale for three weeks in a Louisville paper, and, on January 14, 1884, had offered said premises for sale at public auction at the court house door in Louisville, and that said Company had purchased the same for $25.00.

Afterwards by another deed, executed on November 5, 1889, but dated back as of the first day of August, 1878, Burton and wife quitclaimed, for an expressed consideration of $5.00, all their interest in said 40 acres to said Banking Company.

It will be observed, that the transactions referred to under this branch of the case all occurred during the pendency of this suit for partition begun by the appellees, Perry and Henderson. Burton had entered his appearance in the case as early as August 6, 1873. He filed an answer on January 26, 1881. The Louisville Banking Company was made a defendant on April 19, 1880, filed its answer on April 24, 1880, and a cross-bill on July 3, 1882. Gardner was made defendant on February 11, 1881, and Stucky on December 21, 1882. In all the pleadings of the Banking Company filed in the case prior to July, 1890, it claimed to be mortgagee only, and sought to enforce its mortgage against such interest in the property as might be set off in the partition to Burton, or his assignee. But in answers filed in July and October, 1890,

and in an amended and supplemental cross-bill filed on October 14, 1890, the Banking Company claimed, that it had become the absolute owner of the property through the deeds executed to it by Burton and Stucky, and that whatever interest in the property would have been set off to Burton, or his assignee, before the execution of said deeds should now be set off to it, as owner both of the mortgagee's title and of the mortgagor's equity of redemption.    The Court below held, and we think correctly, that Burton did not part with his right to redeem upon the payment of what is justly due to the Bank.

Leaving out of view, for the moment, the fact, that the deed of January 14, 1884, was signed by Burton, and considering it as a deed executed by Stucky alone as assignee, was it a valid deed?   In other words, did Stucky have any interest, as assignee of Burton, on January 14, 1884, which passed from him to the Banking Company by his deed of that date? Burton had been discharged from bankruptcy more than four years before that deed was executed, and more than three years before the entry of the order appointing Stucky assignee. Gardner had settled his accounts as assignee, and been discharged from his trust, more than three years before Stucky made his deed, and more than two years before Stucky's appointment.   It must be conceded, that the title to the property of the bankrupt passes to the assignee by the execution of the assignment of the register conveying the estate of the bankrupt.   Such assignment relates back to the commencement of the bankruptcy proceeding, and, by operation of law, vests the title to all the bankrupt's property in the assignee.   (Bump's Law and Prac. in Bankruptcy,—10 ed.—page 137, 138, 485). Here, on September 13, 1878, and by relation on August 26, 1878, the title of Burton to the 40 acres was in Gardner as assignee.   But where was the title after the discharge of Gardner on June 26, 1880?

It is well settled, that an assignee is not bound to take possession of, or claim, all the property named in the bank-

rupt's schedule. He may reject such of the assets as may be a burden rather than a benefit to the estate. He may decline to receive property, which is so heavily encumbered as to make it injudicious to receive it. In England, where leasehold estates pass to the assignee in bankruptcy, he is not bound to take the lease and charge the estate with the payment of the rent, if the rent is greater than the value of the lease, but he may abandon it. In such cases, if the assignee declines to receive such property, or elects within a reasonable time not to take it, it remains the property of the bankrupt. (*Smith* v. *Gordan,* 6 Law Rep. 313; *Amory* v. *Lawrence,* 3 Cliff. 523; *Glenny* v. *Langdon,* 98 U. S. 20; *Nash* v. *Simpson,* 78 Me. 142; *Brookfield* v. *Stephens,* 40 Ark. 366.)

The assignee is a trustee, appointed for the purpose of disposing of the assets of the bankrupt, and distributing them among the creditors. He takes the title in his official character as a trustee and as an officer of the court. The bankrupt law makes no provision for the reconveyance of the property, undisposed of by the assignee, to the bankrupt. As the assignee takes no title as an individual, but only as an officer, the title reverts to the bankrupt when the trust is ended, and the officer is discharged. When the creditors are settled with, and the bankrupt is discharged, and the estate is wound up, and the assignee is discharged, the bankrupt becomes re-instated in his original title. It has been said that "the title must be somewhere, and, under these circumstances, it is necessary to regard it as in the only party interested." (*Boyd* v. *Olvey,* 82 Ind. 294; *King* v. *Remington,* 36 Minn. 15; *Stevens* v. *Earles,* 25 Mich. 40; *Jones* v. *Pyron,* 57 Tex. 43; *Reynolds* v. *Crawfordsville Bank,* 112 U. S. 405; Bump's Law & Pr. in Bankr.—10 ed.—pages 507, 669.)

In the case at bar, while Gardner was assignee, the 40 acres were encumbered by the Wallace trust deeds, by the mortgage of the Louisville Banking Company and by a tax deed issued in 1876, and were involved in this litigation be-

gun in 1873. When he made his final report, the facts warranted him in believing that he could realize nothing for the creditors from this land. When he said that it was beyond his control, he said in effect, that he had never taken control or possession of it, but had declined to receive it as an asset. Although he was made a party to the present suit, yet it was not until he had been discharged as assignee, and, therefore, not until all his title, which was official and not individual, had ceased to exist. By his discharge in June, 1880, the title thereafter reverted to Burton, and became re-invested in him.

It necessarily follows from the foregoing considerations, that the order made in December, 1882, appointing Stucky assignee, and the deed of January, 1884, viewed as a conveyance by Stucky alone, were void and of no effect. Stucky cannot be regarded as a successor to Gardner in the office of assignee. Such a successor would only be appointed in case of the death, removal or resignation of the former assignee before the winding up of the bankrupt estate. But where the trust is closed, and the acting assignee has done his duty and has been discharged, a new assignee certainly cannot be appointed without the institution of a new proceeding in bankruptcy in accordance with the provisions of the act. But no such new proceeding for the appointment of Stucky was instituted. We are therefore of the opinion that Stucky conveyed no title to the Banking Company by the deed of January, 1884.

The weight of authority is in favor of the position, that, where the estate is settled and the assignee discharged, the legal title reverts to the bankrupt without a reassignment, so that he or his heirs may bring ejectment. But, if this were not so, the equitable title would clearly be in the bankrupt, and whatever title could be regarded as remaining in the assignee, or in any person subsequently appointed by the court to act as assignee, would be a naked legal title held in trust for the bankrupt. (*King* v. *Remington, supra; Reynolds* v. *Crawfordsville Bank, supra*). Hence, if, by any process of

8—146 ILL.

reasoning, it could be held that Stucky took any title at all, it could have been only a naked legal title vested in him as a trustee for Burton, the holder of the equitable title. Consequently, when Burton united with Stucky in the deed of 1884, his joint execution with Stucky operated as a direction to the latter to convey such legal title for the same purpose, for which Burton was conveying the equitable title.

This leads to an inquiry as to the real object of the execution by Burton to the Louisville Banking Company of the deeds made in January, 1884, and November, 1889. In order to determine whether a conveyance made by the mortgagor to the mortgagee operates as an extinguishment of the right of redemption, it must be made to appear, that the parties intended such conveyance to be a payment of the debt. The intention to pay the debt by a deed of the property will not be inferred, where the creditor retains the evidences of the indebtedness, and the securities pledged for its payment. (*Sutphen* v. *Cushman*, 35 Ill. 186; *Knowles* v. *Knowles*, 86 id. 1; *Dunphy* v. *Riddle*, id. 22; *Bearss* v. *Ford*, 108 id. 16). The deed will not be regarded as a release of the equity of redemption, unless it is made for a consideration which is adequate, and which would be deemed reasonable if the transaction were between other parties. If the value of the mortgaged premises greatly exceeds the debt secured by the mortgage, the fact of such excess will tend to show that a release was not intended. (1 Jones on Mtges. secs. 267 and 340—4th ed.) A subsequent recognition by the mortgagee of the continued existence of the relation of debtor and creditor between the mortgagor and himself will be a circumstance tending to show the absence of such an intention. (1 Jones on Mtges. sec. 267). The relations between the parties, and other facts and circumstances of a nature to control the deed and to establish such an equity as would give a right of redemption, may be shown by parol evidence. (*Knowles* v. *Knowles, supra; Conant* v. *Riseborough*, 139 Ill. 383.)

Applying these principles to the facts of the present case, we think it quite apparent that the deeds made by Burton to the Banking Company were merely intended as additional security for the mortgage indebtedness, and not as releases of the equity of redemption. Neither the mortgage, nor the notes secured thereby, nor the notes pledged as collateral security, were surrendered to Burton or cancelled, but were retained in the possession of the Banking Company. No consideration whatever was received by Burton for making these conveyances to the Company. When they were made, both Burton and the Company were parties to the present litigation, and engaged in contesting the title with Perry and Henderson and others. Burton was a party to the litigation when he executed the mortgage in January, 1877, and assigned it to the Company in August, 1878. He and White and Harris, the latter being president of the Company, all lived in Louisville, and were intimate friends. He had been himself a stockholder and director in the Banking Company. In the assignment of the mortgage to the Company, he had agreed to make all such other and further transfers, assignments and writings as might be necessary. The proof shows, that Burton signed the deeds of 1884 and 1889 in Louisville at the request of Harris. Harris told him, that the attorneys in Chicago had requested the execution of the deeds, and that they were needed in the suit in Chicago, and for the correction of irregularities in former instruments. As there was no seal on the original mortgage, such a defect might be cured by a deed in the nature of a mortgage, executed under seal to the mortgagee. When the deed of 1889 was executed, the value of the property had begun to increase, so as greatly to exceed the debt upon it. We are satisfied from a careful examination of all the evidence, that Burton merely signed these deeds for the purpose of aiding the Banking Company in the defense of the present suit. His compliance with the request of the president of the Company to execute additional papers will be

presumed to have been in pursuance of his previous agreement
upon that subject.    After the execution of the deed of Janu-
ary, 1884, the Banking Company filed pleadings in this case,
in which it recognized the relation of mortgagee and mortga-
gor as still existing between itself and Burton.    In an answer
filed by it on February 2, 1886, to Wallace's cross-bill, the
Company sets up its claim as mortgagee, refers to the amount
due upon its notes, speaks of its lien, and asks that a certain
part of the property be allotted to Burton, or his assignee in
bankruptcy, subject to its lien.    Also, in a cross-bill filed by
the Company on May 6, 1890, after the execution of the deed
of November, 1889, the Company again refers to its lien.    The
recognition in these pleadings of the continued existence of
the lien of the mortgage is wholly inconsistent with the claim,
that the Company had ceased to be mortgagee, and had be-
come the absolute owner of the property.

It is assigned as a cross-error by Burton, that the decree
below is erroneous in requiring him to pay certain moneys advanced by the company after January 14, 1884, for expenses
and counsel fees in setting aside tax deeds upon the prem-
ises in question.    When the property was conveyed to the
company in January, 1884, it thereafter held the legal title
in trust for Burton, subject to his right to redeem it upon
paying the mortgage debt and interest, and such legitimate
disbursements by the company as were necessary to protect
the title.    One of the tax deeds was outstanding before the
mortgage was made, and, although the others were obtained
thereafter, it does not appear that the mortgagee was in pos-
session of the property.    As a general rule, the mortgagee not
in possession is under no obligation to pay the taxes upon the
mortgaged premises.    (1 Jones on Mtges.—4 ed.—sec. 713).
The decree does not allow a counsel fee for the foreclosure of
the mortgage.    The cases, which hold that a counsel fee can-
not be recovered in a decree of foreclosure unless there is a
stipulation in the mortgage allowing it, have no application

here. Here, the mortgagee, being clothed with the legal title by the mortgagor, succeeds in setting aside tax titles for the benefit of the mortgagor as well as for the benefit of the mortgagee. When the legal title shall be restored to the mortgagor upon his payment of the mortgage debt, it will be restored free of tax incumbrances which have been removed by the mortgagee. It has been held, that a court of equity will allow a mortgagee counsel fees incurred in defending his title, without any express contract. (2 Jones on Mtges.—4 ed.—sec. 1606). When the mortgagee pays taxes to preserve his security, he is entitled to recover the amount so paid. (2 Jones on Mtges. sec. 1135; *Wright* v. *Langley*, 36 Ill. 381). Upon a bill to redeem, a mortgagee is entitled to credit for reasonable counsel fees paid in collecting rents and profits. (2 Jones on Mtges. sec. 1138). The point now under consideration is not alluded to by counsel for the Company, and merely referred to without discussion by counsel for Burton. But we see nothing inequitable in allowing these advances, which are not unreasonable in amount.

*There is a controversy in the case between Hansbrough and the Louisville Banking Company.* Hansbrough's claim is, that he was the equitable owner of one half of the 40 acres by reason of his joint purchase thereof with Burton; that Burton held the legal title to one half in trust for Hansbrough; that Harris, the president of the Banking Company, had notice of Hansbrough's interest when he took the assignment of the mortgage to the Company on August 8, 1878; that, by reason of such notice to its president, the Company cannot enforce its mortgage against the one half interest owned by Hansbrough, but can only enforce it against the one half interest owned by Burton.

Hansbrough became a party to this proceeding for the first time on July 19, 1890. On that day he filed an intervening petition, and asked to be allowed to come in as a defendant and answer. The prayer of his petition was granted. He

then answered the original bill, and also filed a bill of interpleader, setting up his claim as above stated. The proof shows, that a written contract was executed between Burton and Hansbrough on March 2, 1871, in which it was agreed that "they are jointly and equally interested in the above described 40 acres of land to the extent of one half each, while the title is in said Burton." This agreement was never recorded. Burton, however, admits the ownership of one half of the land by Hansbrough, and, as against Burton, Hansbrough is entitled to be regarded as such owner. But we think, that the court below decided correctly in holding that his claim cannot be sustained as against the mortgage of the Bank.

When the Banking Company took an assignment of the mortgage, it had no notice of any interest in Hansbrough. It is conceded that the records furnished no notice of such interest. It is contended, however, that the Bank had actual notice. Burton says, that in May, 1873, he went to China, and was gone several months; that, before leaving Kentucky to take this trip, he left certain of his papers and business matters in the hands of Harris as his friend; that he then told Harris of the interest which Hansbrough had in the 40 acres. Harris denies, that Burton gave him any such information, but says that, if Burton did tell him anything about it, it must have been in some casual conversation, and that he had forgotten all about it when he acted for the Bank more than five years afterwards in the matter of the White mortgage. When he took the assignment of the mortgage on August 8, 1878, Harris was acting as the agent of the Banking Company. If he was told in May, 1873, of Hansbrough's interest, he received such information while acting as the friend or agent of Burton. He did not get the notice, if he was notified at all, while he was acting for the Bank, but while he was acting for an individual. The knowledge of the agent must be acquired during his agency, and in the course of the same transaction from which the principal's rights and

liabilities arise, in order to affect the principal with notice, unless it is clear from the evidence, that the information obtained by the agent in a former transaction is so precise and definite, that it is or must be present to his mind and memory while engaged in the second transaction. *(Snyder* v. *Partridge,* 138 Ill. 173). It cannot be said, that a remark made to Harris in a casual conversation in 1873 was present to his mind five years afterwards, when he was engaged in taking security for a debt due to the Bank of which he was president. Moreover, there is no evidence that White, the original mortgagee in the mortgage made by Burton, had any notice whatever of Hansbrough's interest in the mortgaged premises. If White was a *bona fide* owner of the mortgage, the Bank, as his assignee, would take good title, even if its president had notice. It is well settled, that a purchaser with notice may get a good title from a *bona fide* purchaser without notice of prior equities. *(Peck* v. *Arehart,* 95 Ill. 113).

But, in addition to the foregoing considerations, Hansbrough abandoned the land, neglected for years to assert any interest in it, and suffered Burton to be held out to third parties as the owner. He conveyed the title to Burton in January, 1872. In May, 1873, he executed a lease of the land to a tenant of Burton, and himself signed the lease as agent of Burton, and suffered Burton to hold the possession for years thereafter. He delivered up the written contract of March 2, 1871, to Burton, in whose possession it remained until the summer of 1890. Hansbrough went into bankruptcy in April, 1878, and did not schedule any interest in this land as a part of his assets. He admits in his testimony, that he had forgotten all about his interest for seventeen years from 1873 to 1890, and only asserted it in the latter year, because the contract of March 2, 1871, was then discovered among Burton's papers. During these years, he had been a witness in this case, and knew of the mortgage of the Banking Company, and recognized its right to enforce a lien against the

40 acres, and aided its attorneys in asserting those rights. Under all these circumstances, we think that Hansbrough is estopped from denying that the company is entitled to enforce its mortgage against his interest, as well as against that of Burton.

· *As to the tax deeds.* After this cause was reversed and remanded in 1888, it was reinstated in the court below in March, 1889. Thereafter by supplemental bill filed on May 23, 1889, and amendments thereto filed on November 25, 1890, the complainants made John McCaffrey and John J. Mitchell, holders of tax deeds, and James Price, claiming to be their tenant, parties defendant, and alleged the invalidity of such tax deeds, and asked that the same be set aside as clouds. On May 22, 1889, the Louisville Banking Company also filed an amended cross-bill, which was still further amended on May 6, 1890, attacking the tax deeds, and praying for their cancellation. The same allegations as to the invalidity of the tax deeds are made in the bill of interpleader filed by Hansbrough on July 19, 1890, and in a cross-bill filed by Burton on October 14, 1890. The tax deeds are three in number, one dated July 31, 1876, executed to Asahel Gage, who afterwards conveyed to McCaffrey; one dated October 11, 1881, and one, dated December 27, 1883, both issued to McCaffrey. On June 22, 1889, McCaffrey conveyed his interest to Mitchell, who now owns the three tax titles. The decree of the court below declared the deeds to be void, and set them aside.

It seems to be taken for granted by counsel, that the decree was correct, so far as it held the deeds dated July 31, 1876, and December 27, 1883, to be void. As counsel for Mitchell do not attack the finding made by the chancellor in reference to those deeds, we shall assume, that no good reason exists for disturbing such finding.

The only one of the tax deeds, which counsel discuss in their briefs, is the deed dated October 11, 1881. It was made in pursuance of a sale, which took place on August 25, 1879,

for the taxes of 1877 and 1878. The time of redemption expired on August 25, 1881. Section 216 of the Revenue Act provides, that the purchaser at the tax sale, before he can be entitled to a deed of the land purchased by him, shall serve notice on every person in actual possession or occupancy of the land; also on the person, in whose name the same was taxed or specially assessed, if, upon diligent inquiry, he or she can be found in the county; also upon the owners of or persons interested in the land, if they can, upon diligent inquiry, be found in the county, at least three months before the expiration of the time of redemption on such sale. The section, after specifying what the notice shall contain, then provides as follows: "If no person is in possession or occupancy of such land or lot and the person in whose name the same was taxed or specially assessed, upon diligent inquiry, cannot be found in the county, or the owners of, or parties interested in said land or lot, upon diligent inquiry, cannot be found in the county, *then* such person or his assignee shall publish such notice in some newspaper printed in such county, * * * which notice shall be inserted three times, the first time not more than five months and the last time not less than three months, before the time of redemption shall expire."

The statute thus requires, that the person, in whose name the land is taxed, shall be personally served with notice, if, upon diligent inquiry, he can be found in the county. If, upon diligent inquiry, he cannot be found in the county, *then* the notice must be inserted in a newspaper three times. It is only when he cannot be found upon diligent inquiry, that the three notices are to be inserted. The making of diligent inquiry, and the failure to find as a result thereof, must precede the publication. When the party in whose name the land is taxed, cannot thus be found, he is entitled to notice by three publications, not by one publication or by two publications. If the notice is first published once or twice, and *then* the diligent inquiry is made, and the failure to find results therefrom,

the law is not complied with. The statute does not contemplate, that the purchaser shall first publish his notices, and then afterwards make diligent inquiry. Inquiry made before the insertion of the first notice might result in finding the person in whose name the land is taxed—he may leave the county between the first insertion and the second or third insertion. If he can be found at the time when the first notice is inserted, he is not notified in the way required by law, that is, by personal service, but in a way not required by law, that is, by publication. The statute does not permit the holder of the tax certificate to postpone his diligent inquiry, until after he has published his notice. The publication in such case has no legal foundation to rest upon, because it is not justified or authorized until there has first been diligent inquiry resulting in a failure to find. The same observations here made, as to the person in whose name the land is taxed, apply also to the owners, or parties interested.

The affidavits filed by McCaffrey, the purchaser of the 40 acres at the tax sale on August 25, 1879, state, that G. G. Street was the person in whose name the land was taxed, and that R. K. White was a party interested in the land, and that diligent search and inquiry were not made for them until May 21, 1881; but these affidavits also state—though no certificate of publication is filed with them—that the notice, required by section 216, was inserted in the Chicago Daily Evening Journal on the 19th, 20th and 21st days of May, 1881. Thus it appears, that no inquiry was made for Street and White, until the notice had been inserted twice, if not three times, in a newspaper.

The affidavits show, that James Price was in the actual possession and occupancy of the land on May 24, 1881, three days after the last publication of the notice. But whether Price or anybody else was in the possession or occupancy of the land, before, or at the time of, the publication of the notice, or whether the land was vacant and unoccupied at

that time, is not shown. The affidavit of Snow states that he served the notice on Price, as being the only party in the occupancy of the land, on May 24, 1881. The affidavit of Price himself states, that he was on that day the agent of McCaffrey, and on that day served a copy of the notice on another party for McCaffrey and as his agent. It thus appears, that the purchaser at the tax sale served notice upon an occupant claimed to be his own agent and acting in his own interest. The statute, by requiring notice to be served upon every person in actual possession or occupancy of the land, never contemplated that the purchaser at the tax sale should himself create an occupancy, and then hand a notice to the occupant of his own creation. Such service is not a compliance with the law. The possession or occupancy, specified in the statute, is one which is held adversely to the holder of the tax certificate.

We think that the deed of October 11, 1881, was properly held to be void, because the affidavits, filed with the county clerk for the purpose of obtaining it, do not show that the publication of the notice was preceded by the preliminary conditions required by the statute; that is to say, it does not appear, that, before publication was made, no person was in possession or occupancy of the land, or that there had been diligent inquiry for the persons above specified and a failure to find them. (*Gage* v. *Bailey,* 100 Ill. 530).

Counsel for the appellant, Mitchell, rely upon the 4th section of the Limitation Act, which provides that "actions brought for the recovery of any lands * * * of which any person may be possessed by actual residence thereon for seven successive years, having a connected title in law or equity, deducible of record * * * from any public officer or other person, authorized by the laws of this State to sell such land for the non-payment of taxes, * * * shall be brought within seven years next after possession being taken as aforesaid; but when the possessor shall acquire such title after

taking possession, the limitation shall begin to run from the time of acquiring title." Mitchell claims, that McCaffrey was in possession of the land by the actual residence of his tenants thereon for seven successive years, having such a title, as is called for by section 4, under said tax deed of October 11, 1881. The period of seven years is alleged to have begun on February 10, 1882, when McCaffrey executed a lease to the party then in possession, and to have ended before May 22, 1889, when the first amended cross-bill, making the holders of the tax deeds parties, was filed herein.

Any deed, which purports on its face to convey title, may be used as color of title under section 6 of the Limitation Act, which provides for possession and payment of taxes for seven years, and under section 7 of the same Act, which provides for payment of taxes for seven years while the land is vacant and unoccupied. (Starr & Cur. Stat. vol. 2, pages 1538 to 1548, chap. 83). A tax deed may be good color of title under those sections, even though the judgment and precept, upon which it is based, are absolutely void. But it requires something more than mere color of title to constitute the bar contemplated by section 4. (Idem, page 1538). The latter section requires a *prima facie* title. For instance, it was held before the adoption of section 224 of the present Revenue Act, (2 Starr & Cur. page 2101), that a tax deed, without the judgment and precept upon which it is based, is not a *prima facie* title, such as is required by the act of 1835, of which said section 4 was a part. (*Elston* v. *Kennicott*, 46 Ill. 187). By the terms of section 4, the officer must be "*authorized*" to sell the land for the non-payment of taxes. Unless the judgment and precept are produced, no authority to sell is shown. It cannot be said that the language of the section refers to *any* deed, which a public officer may make without pretence of authority. (*Elston* v. *Kennicott, supra.*) On the contrary, the deed is one which is made in pursuance of the authority required by law.

The right of the owner of land, which has been sold for taxes, to redeem it within two years from the sale, is a constitutional right; and the right of the owner to reasonable notice, by publication or otherwise, of the fact of sale and when the time of redemption expires, is also a constitutional right.     The constitution furthermore directs, that occupants shall in all cases be served with personal notice before time of redemption expires.  (Cons. of 1870, sec. 5, Art. 9).  Hence, it is necessary, in order to establish a *prima facie* title under section 4, to show notice, by personal service or by publication, to the owner, before a tax deed of his land can be lawfully executed by a public officer.    Such deed is made without authority unless the notice prescribed by the statute is first given.    Accordingly, the Legislature has provided in section 217 of the Revenue Act, that, before a purchaser at a tax sale or his assignee shall be entitled to a deed, he must, by himself or his agent, make an affidavit of his compliance with the conditions of said section 216 above quoted, "stating particularly the facts relied on as such compliance;" that this affidavit shall be delivered to the person authorized by law to execute the tax deed, and shall be filed by him with the officer having custody of the record of the lands sold for taxes, etc., and entries of redemption, etc. ; that the affidavit is to be entered by such officer "on the records of his office and carefully preserved among the files of his office," etc.  The affidavit required by section 217 must be produced in order to show the *prima facie* title demanded by said section 4.   As the title called for by that section must be "a connected title in law or equity deducible of record," and as the affidavit, showing compliance with the requirements of the statute as to giving notice to the owner, is made a part of the record, the affidavit is a necessary part of the *prima facie* title.  In the present case, however, the affidavits do not show a compliance with section 216 ; they do not show, that such notice by publication as section 216 prescribes was given for the reasons already stated.   It

follows, that the appellant Mitchell has not exhibited such a *prima facie* title as justifies him in relying upon the bar prescribed by said section 4. (*Hughes* v. *Carne*, 135 Ill. 519). Furthermore, we are of the opinion, from a careful examination of the evidence, that McCaffrey obtained the possession, which he pleads as an actual residence, by either forcing or persuading a party, who was holding possession under Burton, to abandon Burton, or those holding under him, and to attorn to McCaffrey. The actual residence specified in section 4 is not an unlawfully acquired possession.

It is conceded, that the evidence does not show possession and payment of taxes by McCaffrey for seven years upon the whole tract of 40 acres. It is contended, however, that McCaffrey acquired title to the N. E. 10 acres of the 40 acres by possession and payment of taxes for seven successive years under the tax deed of October 11, 1881, as color of title. This contention, however, is not supported by the facts. The first payment of taxes made by McCaffrey under his tax deed was on August 5, 1882, and this suit was begun against him on May 22, 1889, as above stated. Seven years did not intervene between August 5, 1882, and May 22, 1889. In order to create a bar under the first section of the Act of 1839, or section 6 of the present Limitation law, seven years must · elapse between the date of the first payment, when the statute begins to run, and the commencement of the suit. (*McConnel* v. *Konepel*, 46 Ill. 519 ; *Lyman* v. *Smilie*, 87 id. 259 ; *Iberg* v. *Webb*, 96 id. 415 ; *Holbrook* v. *Debo*, 99 id. 372.)

The appellant, Mitchell, further claims that the Louisville Banking Company is precluded from the right to file a bill to remove the tax deed of October 11, 1881, as a cloud upon its title, upon the ground, that Burton's assignee in bankruptcy did not file the bill within two years from the time when the cause of action accrued in his favor, and consequently that any suit between him and McCaffrey, or Mitchell, claiming an adverse interest touching this property, was barred under

section 5057 of the Revised Statutes of the United States; and that the Banking Company, as grantee of said assignee in bankruptcy in the deed dated January 14, 1884, was also barred by said section, under the doctrine of *Gage* v. *Dupuy*, 127 Ill. 216, and other cases therein referred to. This point would be well taken, if the Banking Company had no other title, when it filed its bill to remove the tax deed, except that derived from the deed made by Stucky, assignee, in 1884. But the Bank held a mortgage against Burton; and we have recently held that a mortgagee may file a bill to set aside a tax deed as a cloud. (*Miller* v. *Cook*, 135 Ill. 190). Whether a mortgagee in a mortgage, which is not executed under seal, can file such a bill or not is a question, which we do not deem it necessary to pass upon in this case; because, when the company filed its amended cross-bill in May, 1889, it held the legal title by reason of the execution of the deed of 1884 by Burton, the mortgagor; he having united with Stucky in making that deed. The company was mortgagee not only by reason of the original mortgage, but by reason of the convey-ance to it by Burton. A mortgagee, holding under a deed which, though absolute in form, was intended to be only a mortgage security, can certainly file a bill to set aside a tax deed.

Nor do we deem it necessary to consider whether or not the decree of the court below was correct in establishing a lien upon the portion of the land aparted to the complainants, Perry and Henderson, for the payment of one half the amount due to Mitchell for purchase money paid at the tax sales and for subsequent taxes, together with interest. As the decree below must be reversed and the cause remanded, the Court below will change its decree so as to require one fourth of said amount with interest to be paid by said complainants, as a condition precedent to the setting aside of the tax deeds as against their one fourth interest.

We are of the opinion that the decree was correct not only in holding said tax deeds to be void, but also in disallowing the defenses set up by said Mitchell, as the same have been herein referred to.

The decree of the Superior Court is reversed, and the cause is remanded to that Court with directions, that it change and modify its decree so far as it is herein held to be erroneous, and that it enter a decree in accordance with the views expressed in this opinion.

It is ordered, that the costs of this Court be paid, two eighths by the appellees, Perry and Henderson, three eighths by the appellant, the Louisville Banking Company, one eighth by the appellant Mitchell, one eighth by the appellant, Burton, and one eighth by the appellant Hansbrough.

*Decree reversed in part and in part affirmed.*


Subsequently, upon an application for a rehearing, the following additional opinion was filed:

Per CURIAM: Rehearing having been granted in this cause, we have again given the record such consideration as is necessary to a clear comprehension of the points made, and have, upon the merits, reached the same conclusions announced in our former opinion.

It is urged that we should so modify the remanding order that the case may be open for further evidence upon the question of the identity of Asa W. Chambers, who gave his deposition in 1874, with the Asa W. Chambers to whom, with Benedict, the land was conveyed by Cook in 1836. Suggestion is made of newly discovered evidence upon this point, and affidavits in support were filed with the petition for rehearing. This practice is, of course, not allowable, and such affidavits were, on motion, stricken from the files. *Newlin* v. *Snyder*, 78 Ill. 528.

It is, however, insisted, that doubt having been expressed as to the absolute certainty that the persons were identical,

the case should be left open, and appellants permitted to make farther proof. To this we can not assent. If the suggestions of newly discovered evidence be considered as broadly as made by counsel, waiving the objection that it would be cumulative to that already in the record, it must be said that it would at best be inconclusive of the point. It might have been shown that Chambers, who testified, had falsely accounted for his whereabouts and connections, or even had personated another, and that he was wholly unreliable; but the positive identification of the man who testified in 1874, with the man who boarded with the witness Beaubien in 1836 and 1837, and who was the partner of Benedict in those years, and who bought land of Cook, remains. Beaubien, whose integrity is not questioned, recognized Chambers without introduction, had ample opportunity to verify his identification, and testifies positively to the identity.

But the more serious difficulty with the suggestion arises out of the *laches* of the defendants. Chambers came from Texas to Chicago in 1874, and was there some months. The defendants were apprised of the taking of his deposition, and appeared by able counsel, and subjected him to a rigid and thorough cross-examination. He, in addition to Beaubien, gave the names of other residents of Chicago whom he had known in 1836 and 1837, who, presumably, were then alive, (it is not questioned that they were,) and who could have been called to testify as to his identity. The defendants, those most interested, also appeared and cross-examined Beaubien, and if any doubts existed in regard to the identity, or a fraud was being practiced, the evidence, presumably, was then at hand to have put the matter at rest. Chambers had returned to the scene of the transactions of 1836 and 1837, gave the names of a number of those he knew, and, if his identity had been then questioned, these could have been called and the matter established beyond cavil. Moreover, the entire data as to his history and connections, from which it is now sug-

9—146 Ill.

gested it can be shown that the man who testified was not the Chambers of the firm of Chambers & Benedict, doing business in 'Chicago in 1836, were then given by the witness Chambers. All these facts were known to the defendants in August, 1874, If the evidence existed at Georgetown, in Vermilion county, which it is now suggested can be produced, it existed then, and the slightest diligence would have discovered it. But the defendants lie by, through three trials in the Superior Court, and three appeals and decisions of the cause in this court, without making any effort to procure the testimony, and not until after the third and final decision of the cause make these suggestions. In the meantime, by the effect of time, farther proof of identification by those who knew the Chambers of 1836 has been rendered impossible.

It is suggested that the Chambers who testified is, himself, dead, and those who knew him in 1836, if any could be found, could not know the identity of that man with the Chambers of 1874. The suggestion contains none of the elements of diligence which will control the exercise of the discretion of a court of conscience. To now, after the litigation of eighteen years, open up this question of vital importance, and which lay at the foundation of the complainants' right of recovery, would be to reward and foster negligence at the expense of the diligent.

We are of opinion, that as by the decree, as directed to be modified, appellant Wallace will be entitled to a lien for part of the amount secured by the Street mortgage, and that mortgage being senior to the lien of the Louisville Banking Company's mortgage, the decree should be farther modified by giving his lien priority in payment over the lien of the banking company. Also, it is conceded by the defendant Burton, that at the time he executed the original mortgage to White, and at the time of the transfer thereof to the Louisville Banking Company, and since, he had the legal title to one-half of the property in trust, for appellant Hansbrough, according to

the written declaration of trust set out in the record, and the indebtedness to the Louisville Banking Company being that of Burton alone, for which Hansbrough was in no way liable, the decree should be farther modified by requiring satisfaction of said indebtedness out of the share or part of said mortgaged premises declared to be in Burton, and that resort be had to the share or part found to be in Hansbrough, only, to satisfy the balance remaining after the exhaustion of the interest therein of said Burton.

The opinion heretofore filed in the cause will be refiled as the opinion of the court, and the judgment heretofore entered, with the farther modifications directed, will be again entered.

*Decree affirmed in part and in part reversed.*